**In re PEACHTREE LANE ASSOCIATES, LTD., Debtor.**

**Bankruptcy No. 94 B 14909.**

United States Bankruptcy Court,
N.D. Illinois,
Eastern Division.

July 3, 1996.

Mark Naughton, Rudnick & Wolfe, Chicago, Illinois, for Debtor.

Jeffrey W. Finke, Raleigh, Helms & Finke, Chicago, Illinois, for Granader's.

## MEMORANDUM OPINION

RONALD BARLIANT, Bankruptcy Judge.

Section 1408 of the Judicial Code (28 U.S.C. § 1408) provides that a bankruptcy case "may be commenced in the district court for the district in which the domicile, residence, principal place of business in the United States, or principal assets of the person or entity that is subject of such case have been located" for the six-month period preceding the commencement of the case. This matter is before this Court on remand from the district court to determine whether venue of this single asset partnership chapter 11 case properly lies within this district. If venue is proper in this district, this Court has been further instructed to decide whether to transfer the entire case or the pending adversary proceeding to another district in the interests of justice or for the convenience of the parties. *In re Peachtree Lane Assocs. Ltd.*, 188 B.R. 815 (N.D.Ill.1995).[1]

As several courts and commentators have noted, since a partnership does not have a residence or domicile, "the only meaningful venue test with respect to a partnership may be the district in which it has its

---

1. The district court had before it consolidated appeals in both this chapter 11 case and the adversary proceeding *Peachtree Lane Associates, Ltd. v. Harry Granader, et al.*, 94 A 1468. The court vacated and remanded the "order of the Bankruptcy Court denying the Granaders' motion to dismiss or transfer venue of the chapter 11 case on, *inter alia*, venue grounds ... for further proceedings consistent with this opinion." *Id.* 188 B.R. at 832. It does not appear that the district court in fact remanded the adversary proceeding to this Court for any purpose. Rather, that court dismissed the appeal in the adversary proceeding "pending a determination by the Bankruptcy Court as to the proper venue of the underlying chapter 11 case." *Id.*, 188 B.R. at 831 Nevertheless, in the body of the opinion (188 B.R. at 831), the district court instructed this Court to consider the transfer of the adversary proceeding as well, so transfer of that proceeding is discussed herein. This Court's order, however, will be entered in the bankruptcy case, not the adversary proceeding because jurisdiction of that proceeding has not been re-vested in this Court.

principal place of business or its principal assets in the United States." 1 *Collier on Bankruptcy* ¶ 3.02 (15th ed. 1994); *In re Washington, Perito & Dubuc*, 154 B.R. 853 (Bankr.S.D.N.Y.1993). Peachtree's sole asset, an apartment complex, is in Texas. The issue, therefore, is the location of Peachtree's principal place of business during the six months before the filing of the bankruptcy petition. The Granaders (the defendants in the only adversary proceeding in this case) contend that the principal place of business was either Texas, where the property and on-site manager were located, or California, where the property manager was located. The Debtor, on the other hand, contends that venue is proper in this district, where all the significant business decisions were made. As the parties' challenging venue, the Granaders must prove, by a preponderance of the evidence, that the Debtor's principal place of business is elsewhere than in this district. *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1391 (2nd Cir.1990).

After hearing testimony and reviewing the deposition testimony, exhibits and stipulations, this Court concludes that venue is proper within this district under 28 U.S.C. § 1408 because the Debtor's principal place of business was here. This Court further concludes that neither the chapter 11 case nor the adversary proceeding should be transferred to another district.

## FINDINGS OF FACT [2]

### Parties

1. Peachtree was a Texas limited partnership. Its sole asset was an apartment complex in Texas. Peachtree filed its Certificate of Limited Partnership with the Texas Secretary of State on or about June 25, 1984.

2. Harry, Alan and Daniel Granader are the defendants in adversary proceeding No. 94 A 01468. The Granaders own a shopping center next to Peachtree's apartment complex. In the adversary proceeding, after a lengthy trial, this Court found that the Granaders were trespassing by maintaining parking

spaces on Peachtree's property. This Court entered an injunction to remedy that trespass.

3. Peachtree filed its Voluntary Petition in Bankruptcy on July 26, 1994. The one hundred eighty (180) day time period referred to in 28 U.S.C. § 1408 (hereinafter referred to as the "Venue Period") therefore runs from January 27, 1994 through July 26, 1994.

### Structure of the Limited Partnership and the Kemper Corporation

4. Peachtree's sole general partner was Kemper/Cymrot Partners PT, Ltd.; its sole limited partner was Allen Cymrot. Kemper/Cymrot Partners PT, Ltd. owned a 95.5% interest in Peachtree and Allen Cymrot owned a 0.5% interest.

5. The Agreement of Limited Partnership for Peachtree prohibited the limited partner from participating in management and control of Peachtree. That provision was followed and Allen Cymrot did not participate in the management of Peachtree nor was he ever consulted on any decisions by the general partner.

6. During the Venue Period, Kemper/Cymrot Partners PT, Ltd.'s sole general partner was Kilico Realty Corporation ("Kilico"), an Illinois corporation. Kilico is a wholly owned subsidiary of KFC Portfolio Corp., which in turn is a wholly-owned subsidiary of Kemper Financial Companies, Inc., all with headquarters at 120 South LaSalle Street, Chicago, Illinois. Kemper Financial is a subsidiary of Kemper Corporation, which has its headquarters in Long Grove, Illinois. (All of the Kemper related entities will be referred to as the "Kemper Group.")

7. Although the Certificate of Limited Partnership states that the location of the principal place of business is 4001 McEwan, Suite 120, Dallas, Texas, the Debtor did not maintain an office at that address.

### Management at the Kemper Group

8. During the Venue Period, several employees of the Kemper Group were responsi-

---

[2]. To the extent any findings of fact contains a conclusion of law it will stand as an additional Conclusion of Law, and any Conclusions of Law

that contains a finding of fact will stand as an additional Finding of Fact.

ble for making key decisions about the Debtor's business and financial affairs. Mr. Michael Weisel was Vice President of Real Estate Investments of Kemper Corporation, and he worked as one of six Kemper real estate portfolio managers under the supervision of Mr. John E. Neal. Peachtree was one of the assets in Mr. Weisel's portfolio.

9. Mr. John Neal was Senior Vice President of Kemper Corporation. Mr. Neal's responsibilities included management of Kemper's real estate investments and supervision of the real estate portfolio managers (including Mr. Weisel). The total value of real estate under Mr. Neal's supervision during the Venue Period was about $1.3 billion and involved over 400 separate properties. Mr. Neal was also a member of the Kemper Real Estate Investment Committee.

10. Mr. Vincent Cozzi was a Senior Analyst in the Real Estate Investments Group of Kemper Corporation. His duties during the Venue Period included monitoring the month-to-month performance of the Peachtree property by reviewing reports submitted by the property manager for any variance from the budget, and preparing cash flow schedules. During that period, he also assisted in the marketing of Peachtree by putting together a sales package and mailing it to prospective purchasers, and holding discussions with three or four prospective purchasers.

11. Mr. Cozzi was assisted in the day-to-day activities by Mr. Daniel G. Daul, a Financial Analyst in the Real Estate Investments Group of Kemper Corporation. Mr. Daul's responsibilities, related to Peachtree during the Venue Period, included reviewing the monthly operating statements and occupancy and status reports prepared by the property manager. After reviewing those reports he would discuss any major variations with the property manager. Both Cozzi and Daul reported to Mr. Weisel.

12. All of the above-described individuals maintained their business offices at 120 South LaSalle, Chicago, Illinois. Mr. Weisel,

however, has been a resident of Raleigh, North Carolina since well before the Venue Period. Nevertheless, he conducted Kemper business out of the Chicago office.

13. None of these men was an employee of or partner in Peachtree.

14. During the Venue Period, Kemper Group senior managers participated in strategic decisions concerning Peachtree as members of the Kemper Real Estate Investment Committee (the "Committee"). The following individuals were members of the Committee during the Venue Period: Mr. Neal; Frank Collecchia, Senior Vice President of Kemper Financial Services, Inc.; John Fitzpatrick, Executive Vice President and Chief Financial Officer of Kemper Corporation; and Stephen B. Timbers, President and Chief Operating Officer of Kemper Corporation.

15. During the Venue Period, Mr. Collecchia maintained his office at 120 South LaSalle Street, Chicago, Illinois. Mr. Fitzpatrick and Mr. Timbers' offices were located at Kemper Corporation headquarters in Long Grove, Illinois. Mr. Timbers also maintained an office at the Chicago address.

16. "Senior Management" [3] at Kemper were not involved in the day-to-day activities or management of Peachtree. They did not have any detailed knowledge about Peachtree, including such things as how many units Peachtree had.

17. The only decisions Senior Management made with respect to Peachtree were about items presented to and voted on by the Committee. During the Venue Period, Committee meetings were held once or twice a month at 120 South LaSalle Street, Chicago, Illinois.[4]

18. Any decision to sell Peachtree had to be approved by the Committee. Weisel made most of the other day-to-day decisions concerning Peachtree and evaluated the offers to purchase Peachtree.

---

**3.** Senior management refers to John Fitzpatrick, John E. Neal, Harold Guenther, Stephen Timbers and Frank Collecchia.

**4.** If a Committee meeting was not held at the LaSalle Street office, it would have been held in Kemper's headquarters in Long Grove, Illinois.

19. The Kemper Group is structured so that only 5 or 6 people have authority to sign contracts. Mr. Neal signed some Peachtree contracts because his employees did not have signatory authority. He relied upon Weisel's and Cozzi's advise when signing such documents. Mr. Collecchia also had signature authority and he signed the bankruptcy petition.

20. Harold Guenther was Director of Private Placement and Senior Vice President at Kemper Financial Services during the Venue Period. Mr. Guenther was one of the authorized signatories for Kilico. Mr. Guenther was not otherwise familiar with Peachtree. He signed agreements related to Peachtree without any specific knowledge of the document. During the Venue Period, Mr. Guenther's business office was located at 120 South LaSalle Street, Chicago, Illinois.

21. Both the LaSalle Street office in Chicago, Illinois and the Kemper headquarters in Long Grove, Illinois are within the judicial district of the Northern District of Illinois.

### Significant Management Decisions Made by the Kemper Group

#### The Property Manager

22. Before December 31, 1993, and during a transition period in early January 1994, Kemper Residential Management Company, an affiliate of Kemper, handled the day-to-day operations of Peachtree, including issuing reports to Chicago, filing tax returns and writing and signing checks.

23. On December 31, 1993, Peachtree entered into a Property Management Review Agreement, a Disposition Services Agreement and a Property Management Agreement with Western National Securities ("Western National") of Orange County, California. Under the Disposition Agreement, Western National served as a consultant to Peachtree in its efforts to sell the property. Rex DeLong, who worked at Western National's headquarters in Orange County, California, assisted Peachtree in its selling efforts.

24. The term of the Management Agreement was one year with automatic, six month renewal periods, unless terminated. Western National's responsibilities under that agreement included: leasing; collecting rent; paying suppliers, property taxes and other expenses authorized in the budget; and preparing various reports for Kemper.

25. The decision to hire Western National was made prior to the Venue Period by Messrs Cozzi, Weisel and Tom Glidden.[5] The agreements with Western National were negotiated by Mr. Weisel and signed (also before the Venue Period) on behalf of Peachtree (through its general partner Kemper/Cymrot and Kemper/Cymrot's general partner, Kilico Realty Corp.) by Mr. Neal and Richard Curto. (Curto was also an employee of Kemper. His office was at 120 S. LaSalle, Chicago, Illinois, during the Venue Period.)

#### Monitoring Peachtree's Performance

26. The Management Agreement required Western National to submit occupancy reports weekly, and other reports monthly, quarterly and annually. Those reports were sent to, and regularly reviewed by, Daul and Cozzi at their Chicago offices during the Venue Period. Cozzi directed Western National to prepare additional reports, such as one comparing income and expenses for 1993 and 1994.

27. Mr. Cozzi also received and reviewed monthly operating statements from Western National during the Venue Period.

28. On January 31, 1994, Mr. Weisel submitted a quarterly monitoring report to Kemper senior management that showed major variances in operating budgets.

#### The Budget Process

29. Kemper had prepared a draft budget prior to the Venue Period. Under the Management Agreement, Western National was required to manage the property in accordance with that budget until Kemper approved any changes recommended by Western National. Mr. Weisel was responsible for approving any such changes to the bud-

5. Glidden was the head of the Kemper Residential Management Group.

get. Western National requested additional funds for painting and to repair the asphalt. The request was not approved. In general, Weisel would not approve any additional capital expenditures because Kemper intended to sell the property.

30. Debtor's Exhibit 12 explains the line items to be included in Peachtree's 1994 budget. Cozzi and Weisel were responsible for the final approval of these line items as part of the budget process. This process was ongoing during the Venue Period, but the 1994 final budget was not approved during the Venue Period.[6]

*The Sale Process*

31. Debtor's Exhibit 8 is a copy of the information packet that was prepared by Cozzi and Daul for prospective purchasers. They obtained the information in the packet by reviewing internal financial information and outside appraisals. Mr. Weisel approved the final product. The information packet indicated that further inquiries should be directed to Michael Weisel at 120 S. LaSalle, Chicago, Illinois. This package appears to have been prepared just prior to the Venue Period, but was sent by Cozzi and Daul to prospective purchasers during the Venue Period. Specifically, Mr. Daul sent the package to Gables Residential Trust in June, 1994.

32. Efforts to sell the Peachtree property were underway well before the Venue Period. During January 1994, Rutherford Investments had made an offer to purchase the property. On or about January 26, 1994, Mr. Weisel elected to terminate negotiations with Rutherford.

33. On February 28, 1994, Weisel distributed a revised valuation report on properties in the portfolio he managed. Peachtree was one of 47 projects listed in this report. The Peachtree valuation included in the report was prepared by Daul.

34. In March, 1994, Mr. Weisel selected Rudnick & Wolfe ("R & W"), a Chicago law firm, as counsel for Peachtree in connection with a possible sale to Equity Residential. The negotiations between Peachtree and Equity also took place at about that time and were directed by Weisel and R & W on behalf of Peachtree. Mr. Neal also participated in some of the negotiations to sell the property to Equity.

35. Mr. Daul prepared an analysis of the proposed sale to Equity that was presented to the Real Estate Investment Committee on March 8, 1994. The Committee approved going forward with negotiations with Equity. Peachtree was one of nine items discussed during that one hour meeting.

36. After the Committee gave its approval to pursue negotiations with Equity, Weisel directed R & W to prepare a purchase/sale agreement. The draft agreement defined Peachtree's management as Messrs. Weisel, Cozzi and Tom Fraerman, Kemper's in-house attorney.

37. Issues concerning Peachtree were again presented to the Committee at the March 22, 1994 meeting. At that meeting, Weisel made a presentation and the Committee approved the sale of the Peachtree property to the Equity group and set a minimum selling price. Peachtree was one of eight items considered during that 1 hour and 45 minute meeting.

---

**6.** Whether the 1994 budget was approved during the Venue Period was one of only two disputed factual issues. The Debtor was unable to present any documentary evidence that the budget had been approved. The 1994 Budget Log–In report dated April 5, 1994, showed that the budget had been received, but there is no document showing that it had ever been approved. (Debtor's Exhibit 29). Nevertheless Cozzi testified that the budget had been approved, although he was not sure when. However, the Debtor did introduce evidence showing that the budget process was ongoing during the Venue Period (see Debtor's Exhibit 29) and evidence suggesting that the 1994 budget had been approved based upon a vari-

ance report submitted by Western setting forth actual expenditures relative to budgeted expenditures. (Defendant's Exhibit 46). In addition, the Property Management Agreement between Peachtree and Western provides that until Peachtree approved the 1994 Budget, Western would "manage and operate the Property in accordance with the Budget for 1994 delivered by [Peachtree]." (Defendant's Exhibit 21, § 3.1.13). From this evidence the Court is unable to conclude that the 1994 budget was approved. The evidence does, however, clearly establish that the budget process was underway within this district during the Venue Period and was the responsibility of the Kemper Group.

38. In March, 1994, Peachtree and Equity signed the purchase agreement. In April and again in May, Cozzi and Weisel agreed to extend the contingency period expiration date set forth in the purchase agreement. In June, Weisel and Neal concluded that the continuing negotiations with Equity would not result in an acceptable sale and they decided that the negotiations and agreement should be terminated.

39. No other agreement to sell Peachtree's real proeprty was executed during the Venue Period.[7]

*The Negotiations with Smith Barney*

40. Smith Barney Mortgage Capital Group, Inc. was the holder of the note secured by a mortgage on Peachtree's real property (the "Note"). The Note was to mature on April 1, 1994. Weisel and Neal made the decision not to pay the Note when due. In or about April 1994, Weisel hired R & W to represent Peachtree in connection with negotiations with Smith Barney related to the Note and mortgage. Both Cozzi and Weisel had discussions with several people at Smith Barney concerning the maturity of the note and a possible forbearance agreement.

41. *On or about April 26, 1994, Smith Barney sent a forbearance agreement with respect to the Note to Mr. Weisel at his Chicago office.* Weisel and Fraerman discussed the forbearance agreement proposed by Smith Barney and decided not to execute it since they objected to some of its terms. Weisel and R & W continued to negotiate a forbearance agreement with Smith Barney. All of these negotiations took place during the Venue Period. Smith Barney sent Weisel a revised forbearance agreement that incorporated some of the changes requested by Weisel and R & W. Weisel, in consultation with R & W, again decided not to sign the forbearance agreement.

42. On June 15, 1994, Smith Barney sent a letter to Peachtree declaring the loan in default. In a final attempt to enter into a forbearance agreement with Smith Barney, Mr. Weisel sent an executed "pre-workout letter" to Smith Barney. This pre-workout letter was actually Smith Barney's last forbearance agreement, with the provisions Messrs. Weisel and Fraerman objected to deleted. Fraerman and Weisel decided which objectionable provisions should be deleted. The pre-workout letter was executed by Neal and Guenther on behalf of Kilico Realty Corporation. Weisel initialed the letter to indicate his approval.

43. On July 11, 1994, attorneys for Smith Barney sent a letter to Peachtree threatening to foreclose on the property. Weisel, Fraerman and Neal discussed their overall strategy related to the threats made in the letter and decided not to pay the Note.

44. Weisel, Neal and Fraerman decided to file a bankruptcy petition on behalf of Peachtree. In making this decision, no one on-site or at Western National was consulted. Weisel continued to attempt to sell Peachtree notwithstanding the decision to file bankruptcy and on July 25, 1994, Weisel sent an information packet to Dinerstein Companies.

*Business Activity in California*

45. During the Venue Period, Western National, located in California, was the property manager for Peachtree's sole real estate asset.

46. Cathy Escobar was Vice President/Controller for Western National and worked in their Walnut Creek, California regional office. She had been employed by Western National since January 1994 and prior to that worked for Kemper Residential Management Company, an affiliate of the Kemper Group and Peachtree's prior manager. During 1994 Escobar was responsible for accounting and financial reporting for the property and for

7. The second disputed issue of fact concerned when the negotiations with Apollo Real Estate Investment Fund ("Apollo") for the purchase of the Property commenced. The Debtor contends that those negotiations commenced during the Venue Period, while the Defendants argue that they did not take place until after the bankruptcy petition had been filed. The court finds that the negotiations with Apollo did not take place until after the bankruptcy petition was filed. They are, therefore, not relevant to the determination of where the Debtor's principal place of business was located.

overseeing the payment of Peachtree's real property taxes. The accounting department of Western National processed the bills for Peachtree, issued checks and prepared some month-end closing reports. She also provided financial records and due diligence materials to prospective buyers, and had some discussions with Rex DeLong (another Western National employee) Weisel and Cozzi about offers to purchase Peachtree. Mr. DeLong assisted Kemper in marketing and selling Peachtree. He prepared a summary of offers that was distributed to Kemper people.

47. Ms. Escobar only visited the property once, and that was in 1990. During the Venue Period, she was in regular telephonic contact with the on-site property manager.

48. Western National prepared and filed Peachtree's 1993 and 1994 federal income tax partnership return with the Internal Revenue Service Center in Ogden, Utah. That is where California taxpayers file their returns.

### Business Activity in Texas

49. During the Venue Period, Peachtree's principal assets (within the meaning of 28 U.S.C. § 1408) were located within Texas. Its apartment complex was located in the City of Webster, in the County of Harris, in the State of Texas. It received all its revenue from rent payments by tenants at that complex.

50. There was an on-site property manager and other personnel working at the apartment complex. These Texas employees collected rent payments from tenants and carried out day-to-day operations of the apartment complex subject to and in accordance with the provisions of the Property Management Agreement.

51. Billi Crowley was the resident manager of Peachtree during the Venue Period. As resident manager she was responsible for marketing efforts, leasing apartments, collecting rents, overseeing the staff and preparing monthly operating reports. Her activities took place in Texas. Ms. Crowley was employed by Western National and some responsibilities were handled in conjunction with Western National. For instance, the decision to increase rent was made by Crowley and the regional manager of Western National[8] and Crowley approved the payment of bills to local suppliers while Western National actually issued the checks.

52. Peachtree also had a Texas lawyer who filed complaints in Texas courts to evict tenants. (Peachtree never filed any complaints in Illinois courts.)

53. Ms. Crowley had no involvement with the more significant financial issues. She did not know whether Peachtree made or lost money in a given period; her job was to merely ensure that the property was operated within the budget given her. Ms. Crowley also did not have any dealings with Smith Barney.

54. During the Venue Period, Peachtree had no telephone listing in Illinois, was not registered or certified to do business in Illinois and paid no tax to any state or local government agency in Illinois. Peachtree had no employees in Illinois; no office in Illinois with its name listed on the door; no post office box in Illinois and it did not file any complaints in any Illinois judicial forum. Its telephone numbers were listed in a Houston, Texas, area telephone directory. Peachtree had accounts with banks or financial institutions in Webster, Texas; Santa Ana, California; San Francisco, California; and Kansas City, Missouri, but none in Illinois. Most of the Peachtree's suppliers were either located in Texas or had local agents in Texas. They were paid by checks issued on the bank accounts listed above. Peachtree's bills were processed and paid in California and Texas.

55. None of the persons having business addresses in the Northern District of Illinois whom Peachtree claims were significant decision makers with regard to Peachtree had ever visited Peachtree's real property or spoke to anyone who worked at the apartment complex at any time before the commencement of Peachtree's Chapter 11 case. None of them had ever personally participated in the operation of the apartment complex. For example, none placed any advertising to attract any prospective tenants or

---

8. That regional manager worked out of the Atlanta, Georgia regional office.

signed any of Peachtree's checks or contracts for repairs.

### Facts Relevant to Transfer of the Case of the Adversary

56. Peachtree sought and obtained from this Court authority to retain special counsel in Texas to advise it on Texas real property issues in this case.

57. The only adversary proceeding in Peachtree's Chapter 11 case is the real property dispute Peachtree brought against the Granaders, Adversary Proceeding No 94 A 01468. This Court entered a final judgment and permanent injunction in that proceeding on December 27, 1994; the only matters remaining to be resolved in the adversary proceeding are the Debtor's motions for an award of attorney fees and sanctions. There are no pending motions related to enforcement or interpretation of the permanent injunction. However, Alan Granader testified that there is an ongoing dispute over the easement related to a solid fence constructed on the disputed area by the new owner of the property.

58. No creditor or party in interest, except the Granaders, objected to the venue of Peachtree's bankruptcy proceedings in the Northern District of Illinois.

59. A plan of reorganization was confirmed on January 5, 1995. The property has been sold. Other than the fees and sanctions issues in the adversary proceeding, there are no other pending matters in this case.

### Principal Place of Business

60. During the Venue Period, the Debtor's principal place of business was in Chicago, Illinois.

### CONCLUSIONS OF LAW

*Standard for Determining Principal Place of Business*

Before remanding the case to this Court for further proceedings on the issue of venue, Judge Castillo discussed the standards for finding the principal place of business of a partnership.

"In determining the principal place of business of a partnership or corporation, courts have routinely looked to where significant business decisions are made, sometimes described as the debtor's 'nerve center.'" *See,* e.g., *In re Washington, Perito & Dubuc,* 154 B.R. at 859; *In re Suzanne de Lyon, Inc.,* 125 B.R. 863, 867; *In re Garden Manor Assocs., L.P.,* 99 B.R. 551 (Bankr.S.D.N.Y.1988); *In re Willows Ltd., Partnership,* 87 B.R. 684, 685 (Bankr. S.D.Ala.1988); *In re 1606 New Hampshire Ave. Assocs.,* 85 B.R. 298, 303 (Bankr. E.D.Pa.1988); *but see In re Great Lakes Hotel Assocs.,* 154 B.R. 667, 672 (E.D.Va. 1992) ("noting that the 'nerve center' determination 'does not de facto resolve the question of 'principal place of business.'") And, the 'business decisions' test is applicable regardless of the location of the debtor's assets. *In re Washington, Perito & Dubuc,* 154 B.R. at 859; *In re Suzanne de Lyon, Inc.,* 125 B.R. at 867; *In re Willows Ltd., Partnership,* 87 B.R. at 685. [*Peachtree Lane,* 188 B.R. at 830].

The Granaders summarize their position on "principal place of business" as "where business in fact is transacted; namely, where the bankrupt has had dealings with the public, interested parties, and creditors." *Granaders Pre-hearing Brief* at p. 10. The Granaders contend that "where business is in fact transacted" is the test for principal place of business set forth in the only Supreme Court case addressing the appropriate venue of a debtor corporation or partnership. *See Royal Indemnity Co. v. American Bond & Mortg. Co.,* 289 U.S. 165, 53 S.Ct. 551, 77 L.Ed. 1100 (1933). *Royal Indemnity* has not been recently cited as precedent for determining principal place of business in a bankruptcy case, nor, as the Granaders have pointed out, was it included in the annotations to the venue statute (§ 1408). There are undoubtedly two reasons for this. First, the factual situation in *Royal Indemnity* presented the Supreme Court with a rather simple determination: venue was either proper in Maine, the state of incorporation, or in Illinois where the offices were located

and all business was conducted.[9] The Supreme Court was not required to deal with the more complicated scenario, present here, where senior management and key decision makers are separated by state borders from on-site personnel and the physical assets. Second, *Royal Indemnity* was decided under § 2 of the Bankruptcy Act, which limited venue to principal place of business. Under § 1408 and the Bankruptcy Code, the venue statute has been amended to allow a case to be filed *either* where the assets are located, *or* where the principal place of business is located, thus recognizing that the two may be different places.[10]

On the other hand, a majority of more recent bankruptcy decisions have applied the nerve center test. Those are the decisions Judge Castillo cited with approval in the above-quoted excerpt of his opinion in this case. While this Court is not bound by the district court's discussion about principal place of business, it finds that discussion and the reasoning of the cited cases persuasive.

Under the nerve center test a partnership's principal place of business is where "significant business decisions are made." *Peachtree Lane,* 188 B.R. at 830. In *In re Suzanne de Lyon, Inc.,* 125 B.R. 863 (Bankr. S.D.N.Y.1991) the court determined that the debtor's principal place of business was in New York where the president/chairman of the corporation made the important management decisions involving product lines, marketing and financing for the company. New York was the proper venue even though the corporation's employees were located in Houston, the debtor maintained an office and telephone numbers in Houston, the books and records were located in Houston, checks for payroll and payments to suppliers were issued out of the Houston office, and the debtor was incorporated in Texas and not qualified to do business in any other state.

*In re Washington, Perito & Dubuc,* 154 B.R. 853 (Bankr.S.D.N.Y.1993) involved a law firm partnership that had, at one time, offices in Washington, D.C., New York, Baltimore and Fairfax County, Virginia. An involuntary bankruptcy petition was filed in the Southern District of New York. On a motion to transfer venue the court concluded that the debtor's principal place of business was where the wind down committee made the major decisions for the debtor. Since the wind down committee met in Washington, D.C., that was the debtor's principal place of business. Several other courts addressing the issue have similarly concluded that principal place of business is where the significant decisions are made, not where day-to-day operations are conducted. *See Peachtree Lane,* 188 B.R. at 830 and cases cited therein.

In this case, the evidence establishes that the significant business decisions of the Debtor were made by Mr. Weisel and other employees of the Kemper Group at their offices in Chicago and Long Grove, Illinois. Leading up to the Venue Period, the Kemper Group decided to hire Western National as the property manager. The Management Agreement, which governed the division of responsibilities and control between the Kemper Group and Western National during the Venue Period, was carefully drafted to ensure that financial control was retained by the Kemper Group. The Disposition Services Agreement, which provided that Western National would assist Peachtree in its efforts to sell the property, also retained the authority to approve any sale with Kemper personnel in Chicago.

Throughout the Venue Period, Messrs. Cozzi and Daul closely monitored Peachtree's operations by reviewing Western National's reports. The process of approving the 1994 budget was ongoing throughout the Venue Period. This process took place in Chicago

---

9. The debtor had actually ceased to do business and a receiver had been appointed when the bankruptcy petition was filed. The receiver, however, also conducted the winding up of the business in Illinois.

10. The Defendants cite a number of cases decided under the Bankruptcy Act. Due to the change

in the venue statute this Court does not believe that those cases should be considered as valid precedent. *See In the Matter of Commonwealth Oil Refining Co., Inc.,* 596 F.2d 1239, 1245 (5th Cir.1979) (the court also noted that the considerations of venue in a bankruptcy case are different from those in a diversity case).

with the involvement of Messrs. Daul, Cozzi and Weisel. While Western National did assist Peachtree in selling the property, the negotiations with any serious prospective buyer were carried out by Michael Weisel and any decision to sell the property had to be made by the Real Estate Investment Committee, based upon his advice. Kemper personnel in this district decided which negotiations to pursue and when to terminate them. Mr. Weisel was also the person responsible for making some of the most important decisions relating to the Smith Barney Note: whether the Note should be paid, whether Kemper should buy the Note, whether Peachtree and Smith Barney could negotiate a forbearance agreement. Finally, the decision to file a bankruptcy petition was made by Messrs. Weisel, Neal and Fraerman, in Chicago.

In urging this Court to find that the Debtor's principal place of business was California or Texas, the Granaders' focus on day-to-day activities such as the processing of bills, marketing efforts by the on-site manager and leasing of the units. These routine activities are not, however, the significant management decisions that the courts have found determinative. *See In re 1606 New Hampshire Ave. Assoc.,* 85 B.R. 298 (Bankr.E.D.Pa.1988) (venue proper in Pennsylvania where general partners made all the significant management decisions, even though the property and property management company hired to perform day-to-day management services were in Washington, D.C.); [11] *In re Vienna Park Properties,* 120 B.R. 320 (Bankr. S.D.N.Y.1990) (venue proper in New York where the general partners resided, even though the on site manager made a number of the day-to-day decisions at the property location in Virginia and the general partners frequently only rubber stamped the on site manager's decisions).[12]

The nature of the chapter 11 process is the reason courts focus on where significant business decisions are made, as opposed to decisions related to day-to-day operations. When a single asset real estate entity files a petition under chapter 11, the case is not likely to be about renegotiating the individual leases or deciding to increase rent $25.00 a month. The typical chapter 11 case for a single asset real estate entity is about raising new capital, renegotiating loan terms, or, if that cannot be done, attempting to "cram down" a plan on the secured creditors, or selling the asset. In determining where venue is proper in such a case, courts therefore look to where those persons who will make those key decisions are located. In this case, without question, those key decision makers were located within this district. *See Garden Manor,* 99 B.R. at 554–55 (court found venue proper in New York where general partner resided, even though onsite manager, in Arizona, made the day-to-day decisions. The court stated: "[T]his case will turn on whether the debtor can raise capital to fund a plan of reorganization, renegotiate its loan terms with FNMA, locate a purchaser for the property, or, should those efforts fail, cram down FNMA as the debtor asserts it can. Because the general partner

---

**11.** In *1606 New Hampshire Ave.* the court also said that the debtor should not be estopped from establishing that its principal place of business for purposes of bankruptcy venue was different from "the recitation in the regulatory-agency filings in D.C. that its principal place of business was in D.C." *Id.* at 302. This court attaches little weight to the fact that the Certificate of Limited Partnership recited that the principal place of business was in Texas. That Certificate was filed in 1984, approximately 10 years prior to the relevant statutory period. In addition, the Certificate recited a business address in Dallas, Texas, where, in fact, the Debtor never had an office.

**12.** The Granaders also rely upon *In re Great Lakes Hotel Assocs.,* 154 B.R. 667 (E.D.Va.1992) a case that the district court referred to with a "but see" reference, after citing the cases supporting the nerve center test. In *Great Lakes* the bankruptcy court concluded that the debtor's principal place of business was in Erie, Pennsylvania, where its "actual operations" were conducted. On appeal, the court had to determine whether it was improper for the Virginia bankruptcy court to have retained jurisdiction. The court neither accepted or rejected the nerve center test. It stated that "neither the nerve center theory nor [other tests] should be used to the exclusion of the other." *Id.* at 672. The court also stated that "[w]here a bankruptcy action will focus on financial decisions and the formulation of a reorganization plan, the weight given factors which coincide with the 'nerve center' analysis may be greater." *Id.* at 672, n 3.

conducts its business in New York, any efforts along these lines will necessarily take place in New York.") In those rare cases in which local issues (such as tenant disputes or mechanics liens) are critical, venue may be transferred. But the Debtor's nerve center is always a proper venue.

These principles apply to this case. It is unfortunately true that the simple adversary proceeding involving a few parking spaces and an easement has become the principal activity in this case. Nevertheless, the core of this bankruptcy case is not the Granaders' fanatic defense of their right to trespass, but the sale of the property and payment of creditors. That was achieved through the vehicle of a chapter 11 plan. All the negotiations, judgments and decisions leading to that plan were made, on the Debtor's side, by people whose offices are in this district. It was never difficult to get necessary information from Texas and California, just as, before the bankruptcy, the Kemper Group received routine reports about the property.

For these reasons, the evidence relied upon by the Granaders does not weigh in favor of placing venue in another district. Billi Crowley, the onsite property manager, would not be the person to assist in the formulation of a plan of reorganization. She did not even know if Peachtree made or lost money and she had no significant dealings with the mortgagee or prospective purchasers. Western National, despite its authority to issue checks to pay suppliers, was required to manage the property in accordance with the draft budget prepared by Kemper or the final budget approved by Kemper. Western National could not, for example, decide to make capital improvements to the property. And although Western National was to assist Peachtree in efforts to sell the property, it did not have authority to approve any sale, nor was it responsible for the conduct of negotiations.

Section 1408 permits a debtor to choose venue in either the place where it has its principal assets or where its principal place of business is located. That the statute permits either establishes that Congress contemplated that they might be in two different districts. In this case the Court finds that the Debtor's principal place of business was in Chicago, Illinois, and, therefore, venue is proper in this district.

### Transfer of Case or Proceeding

The district court also directed this Court to consider whether the chapter 11 case or the adversary proceeding should be transferred to another district. Section 1412 of title 28 authorizes the transfer of a case or proceeding "in the interests of justice or for the convenience of the parties." In deciding whether the "interest of justice" authorizes a transfer of a case or a proceeding, a court should consider "whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." *Manville,* 896 F.2d at 1391. The party moving for a change of venue has the burden of proof. Moreover, there is a presumption that the district in which the bankruptcy case is pending is the appropriate district for other proceedings. *Manville,* 896 F.2d at 1390–91.

With respect to the case, no serious argument can be made for transfer. No creditor objected to venue. The people who were involved in dealing with the mortgage and sale of the property, and negotiating and formulating a plan, are here. Nobody in Texas had anything to do with those matters. A plan has now been confirmed and substantially consummated. The property has been sold. The only thing left to do is resolve the adversary proceeding against the Granaders and close the case. If another issue did arise it is the Kemper people and their Chicago lawyers who would have to deal with it, and they could do that better here than in Texas. Transfer would be neither convenient for the parties nor just.

With respect to the adversary proceeding, this Court entered a final judgment and permanent injunction after a lengthy trial. The Granaders maintain that Houston, Texas is the appropriate forum to decide any continuing disputes concerning the injunction. But there are no disputes concerning the injunction.[13] If disputes do arise concerning that

---

**13.** There may be a dispute about a fence between

the new owner of the former Peachtree property

284

injunction, this Court is uniquely qualified to decide those disputes by interpreting its own order.

The only issues now before this Court are the Debtor's request for fees and expenses under the easement and its motion for sanctions. This Court has already construed the easement provision relating to fees and the conduct for which sanctions are sought happened in this court. Neither of those matters can be decided without a thorough understanding of what has occurred throughout these proceedings. To transfer this proceeding and pending matters to another bankruptcy judge would be an incredible waste of judicial resources, requiring the new bankruptcy judge to completely review the docket, trial transcripts, briefs and memorandum opinions and orders previously entered. A transfer would therefore not promote the efficient administration of the estate; rather, it would substantially delay the administration of the estate.

Nor would a transfer of the proceeding be convenient for the parties. The matters now pending have little to do with parking spaces in Texas. They have to do with the proceedings in this court. The people most familiar with those proceedings are the Chicago lawyers who participated in them. Transfer of this matter now would require the parties to hire new lawyers in Texas, and those lawyers would never become as familiar with the history of the case as the Chicago lawyers now involved. Accordingly, this Court also finds that transfer of the adversary proceeding would not be appropriate under § 1412.

## CONCLUSION

For the reasons set forth above this Court finds that the Debtor's principal place of business during the Venue Period was in Chicago, Illinois, and venue of the bankruptcy case is proper within this district. This Court further concludes that neither the chapter 11 case nor the adversary proceeding should be transferred to another district. An order will be entered in accordance with this Opinion.

and the Granaders, but that does not involve the Debtor and is unlikely to be within bankruptcy

## ORDER

This matter comes before the Court on order of the District Court remanding the "Granaders motion to dismiss or transfer venue of the chapter 11 case on, *inter alia,* venue grounds." For the reasons set forth in the memorandum opinion of even date herewith, the motion is denied.

jurisdiction in this case, wherever it is venued.