ILANA DIAMOND ROVNER, Circuit Judge.
 

 The primary issue in this appeal, one that we encounter infrequently, concerns the proper venue for a reorganization proceeding under Chapter 11 of the Bankruptcy Code. Harry, Alan, and Daniel Granader (the “Granaders”) believe that venue for the Chapter 11 bankruptcy filed by Peachtree Lane Associates, Ltd. (“Peachtree”) was improper in the Northern District of Illinois because Peachtree did not maintain its principal place of business or its principal assets in that district. In asking us to find venue improper, the Granaders are indirectly challenging a judgment the bankruptcy court entered against them on an adversary complaint Peachtree filed. Because venue for the underlying bankruptcy was improper, the Gra-naders assert, the judgment entered against them in the adversary proceeding cannot stand. For the reasons that follow, we conclude that the bankruptcy court did not clearly err in finding venue proper in the Northern District of Illinois. We also cannot accept the Granaders’ contention that they were entitled to a jury trial on the issues raised in the adversary complaint and in their own counterclaims. We therefore affirm the judgment entered below.
 

 I.
 

 At the time of the events at issue in this case, Peachtree was a Texas limited partnership that owned and operated a 400-unit apartment complex in Webster, Texas. It filed this Chapter 11 bankruptcy in July 1994 after its largest secured creditor took steps to foreclose on the property. The bankruptcy itself was relatively straightforward. Pursuant to its plan of reorganization, Peach-tree sold the property and paid its secured
 
 *790
 
 creditors and non-insider unsecured creditors in full. The adversary proceeding Peachtree initiated against the Granaders has been the bankruptcy’s only complicating factor. The dispute in the adversary proceeding is over an easement agreement governing the use of a private road owned by Peachtree. The Granaders are owners of a shopping center adjacent to Peachtree’s apartment complex, and under the agreement, they have a non-exclusive easement for the use of the road, which connects both the apartment complex and the Granaders’ shopping center to a public thoroughfare. Peach-tree alleged in its adversary complaint that certain parking spaces and landscaped areas that were part of the Granaders’ parking lot were encroaching upon the access road and thus violating the easement agreement. This alleged encroachment was preventing Peachtree from delivering free and unencumbered title to its property to a prospective purchaser. Thus, Peachtree sought in its adversary complaint a declaration of the parties’ rights under the easement agreement and an injunction against further encroachment upon its property. The Granaders responded with a six-count counterclaim, which alleged such' things as slander of title, commercial disparagement, and tortious interference with prospective business advantage. After concluding that the Granaders had no right to a jury trial because they had submitted a proof of claim against Peachtree’s estate, the bankruptcy court conducted a trial on the adversary complaint and the Granaders’ counterclaims, and entered a judgment for Peachtree on both. The bankruptcy court found that the Granaders were trespassing on Peachtree’s property, and the court therefore permanently enjoined the Granaders from further violations of the easement agreement. The Granaders challenged that judgment in an appeal to the district court, but that court affirmed
 
 (In re Peachtree Lane Assoc., Ltd.,
 
 206 B.R. 913 (N.D.Ill.1997)), and the Granaders have not pursued their arguments addressed to the merits of that judgment here. They instead have challenged the venue of the underlying bankruptcy, as well as the bankruptcy court’s denial of their alleged right to a jury trial.
 

 The bankruptcy court conducted an extensive evidentiary hearing on the venue question and issued detailed findings of fact and conclusions of law.
 
 In re Peachtree Lane Assoc., Ltd.,
 
 198 B.R. 272 (Bankr.N.D.Ill.1996), aff
 
 'd,
 
 206 B.R. 913 (N.D.Ill.1997). Because the Granaders have not contested the factual findings underlying the venue determination, we provide here only a general overview of the facts recited in the bankruptcy court’s opinion. The facts described herein relate to the 180-day period preceding the commencement of Peachtree’s bankruptcy (the “venue period”), which ran from January 24, 1994 through July 26, 1994.
 
 See
 
 28 U.S.C. § 1408(1).
 

 During the venue period, Peachtree was a limited partnership whose sole asset was an apartment complex in Webster, Texas. Peachtree ultimately was controlled by what the bankruptcy court referred to as the “Kemper Group,” a series of limited partnerships and corporate entities that eventually linked Peachtree to the Kemper Corporation. The link between the two followed this trail: Kemper/Cymrot Partners PT, Ltd., Peach-tree’s sole general partner; Kilico Realty Corporation, Kemper/Cymrot’s sole general partner; KFC Portfolio Corp., Kilieo’s parent company; Kemper Financial Companies, Inc., KFC Portfolio’s parent company; and Kemper Corporation, Kemper Financial’s parent company. All of these Kemper entities were headquartered in Chicago or Long Grove, Illinois.
 

 Peachtree’s day-to-day operations during the venue period were managed by Western National Securities (“Western National”), an entity based in Orange County, California. Kemper executives in Illinois made the decision to hire Western National approximately one month before the start of the venue period. The relationship between Peachtree and Western National was governed by a series of three agreements, which were negotiated and executed on Peachtree’s behalf by a Kemper executive in Chicago. Under the agreements, Western National was charged with leasing the apartments, collecting rent, paying suppliers, property taxes, and other authorized expenses, and with submitting various weekly, monthly, quarterly, and an
 
 *791
 
 nual reports to the Kemper Group. Western National managed Peachtree’s property during the venue period in accordance with a draft budget that Kemper had prepared pri- or to the venue period. A final budget was to be approved by Kemper after consideration of any changes Western National might suggest, but the final budget was not ultimately approved prior to the filing of Peach-tree’s bankruptcy. Thus, despite Western National’s intimate involvement with Peach-tree’s finances, the Kemper Group retained ultimate financial control over Peachtree’s operations. Pursuant to one of the three agreements, Western National also served as a consultant to Peachtree’s efforts to sell the apartment complex, and the Western National employee who performed that consulting-work was located neither in Chicago nor in Texas, but in Orange County, California.
 

 Kemper also took several steps to sell the Peachtree property during the venue period. Two Kemper employees prepared a packet of information about the property that Kemper then distributed to prospective purchasers during the venue period. The packet indicated that further inquiries should be addressed to a Kemper executive in Chicago. All negotiations relating to the proposed sale of the property were handled by Kemper executives or Kemper’s outside legal counsel in Chicago. Kemper’s Real Estate Investment Committee was required to approve any sale of the property, and all four of the Committee’s members were located either in Chicago or Long Grove, Illinois. During the venue period, the Investment Committee approved the pursuit of a proposed sale to Equity Residential. At a later meeting, the Investment Committee approved the proposed sale itself and set a minimum price Kemper would accept for the property. The proposed sale to Equity Residential was never consummated, however, and Kemper eventually sold the property to another purchaser in connection with Peachtree’s bankruptcy.
 

 Kemper executives in Chicago also made a series of decisions with respect to Peach-tree’s largest secured creditor — Smith Barney Mortgage Capital Group. Smith Barney held a secured note on the property that was scheduled to mature on April 1, 1994, and two Kemper executives decided that Peach-tree would not pay the note when -due. Smith Barney sent Peachtree a proposed forbearance agreement, and Kemper and its outside counsel then attempted to renegotiate certain terms of that agreement. A Kemper executive, in consultation -with counsel, ultimately decided that Peachtree would not execute the forbearance agreement. When Smith Barney then threatened to foreclose on the property, Kemper executives in Chicago decided that Peachtree should file a petition in bankruptcy. Neither Peachtree’s on-site employees nor anyone at Western National was consulted on that decision.
 

 At the same time that Kemper employees were engaged in these activities in Chicago and Long Grove, Illinois, Western National was managing Peachtree’s day-to-day operations in Texas. Billi Crowley served as the resident manager of the apartment complex during the venue period, and she supervised several other on-site employees. Crowley was responsible for marketing the apartment complex to prospective tenants, leasing the apartments, collecting rents, and preparing Peachtree’s monthly operating reports. In conjunction with Western National’s regional manager, who was based in Atlanta, Crowley made the decision to increase rents at the complex. She also approved the payment of bills to Peachtree’s suppliers, most of whom were located in Texas. Peachtree’s bills were paid out of bank accounts maintained either in Texas or California. On the larger financial issues, however, Crowley had no involvement.
 
 [1]
 
 In fact, she was unaware of whether Peachtree made or lost money in any given period. She merely attempted to operate the property within the budget provided to her.
 

 Given all of these facts, the bankruptcy court found that Peachtree’s principal place of business was located in the Northern District of Illinois because it was there that the debtor’s significant business decisions during
 
 *792
 
 the venue period were made.
 
 In re Peachtree Lane Assoc.,
 
 198 B.R. at 281-83. Judge Bariiant acknowledged that Peachtree’s day-to-day activities were directed by the on-site manager in Texas, but he did not find those routine operational activities to be as significant to this reorganization proceeding as the management decisions made by Kemper executives in Illinois. Judge Bariiant specifically highlighted decisions made in the Northern District of Illinois relating to the Smith Barney note, to Kemper’s efforts to sell the Peachtree property, and to the decision ultimately to file a petition in bankruptcy.
 
 Id.
 
 at 281-82. The bankruptcy court found that Peachtree’s “nerve center” was in the Northern District of Illinois, making venue proper in that district.
 
 Id.
 
 at 283.
 
 [2]
 
 On appeal to the district court, Judge Castillo found no clear error in the bankruptcy court’s venue determination.
 
 In re Peachtree Lane Assoc.,
 
 206 B.R. at 924. The district court therefore affirmed the venue finding, prompting the Granaders to bring the issue before this court.
 

 II.
 

 Our analysis of the venue issue begins, naturally, with the language of the statute at issue. Section 1408 provides that a case under Chapter 11 of the Bankruptcy Code may be commenced in the district:
 

 (1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred- and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or
 

 (2) in which there is pending a case under title 11 concerning such person’s affiliate, general partner, or partnership.
 

 28 U.S.C. § 1408. Subsection (2) of the venue statute is inapplicable here, as there is no pending Chapter 11 proceeding involving an entity or individual affiliated with Peachtree. All parties agree, therefore, that venue in this case must be determined solely by reference to subsection (1). Neither Peachtree nor the Granaders have ever suggested that as a limited partnership, Peachtree has a domicile or a residence for purposes of § 1408(1).
 
 See
 
 1
 
 Collier on Bankruptcy
 
 ¶ 4.01[2][d], at 4-7 (15th ed. 1998) (“[I]t is difficult to see how a partnership can be said to have a residence or domicile.”);
 
 see also In re Vienna Park Properties,
 
 120 B.R. 320, 327 (Bankr.S.D.N.Y.1990),
 
 vacated on other grounds,
 
 125 B.R. 84 (S.D.N.Y.1991);
 
 In re Greenridge Apartments,
 
 13 B.R. 510, 512 (Bankr.D.Haw.1981). We thus need not concern ourselves with those aspects of the venue statute. Both sides agree, moreover, that Peachtree’s principal assets are located in Webster, Texas, meaning that venue would be proper in the Southern District of Texas. The dispute here is whether venue also was proper in the Northern District of Illinois because Peachtree’s principal place of business was located in that district during the 180 days preceding the commencement of its bankruptcy. Peachtree contends that the lower courts correctly found that it was, while the Granaders insist that Peachtree’s principal place of business was in Texas, the location of its only asset and its day-to-day operations.
 

 Because Peachtree filed its Chapter 11 bankruptcy in the Northern District of Illinois, venue in that district is presumed to be proper, and the party challenging venue bears the burden of establishing by a preponderance of the evidence that the ease was incorrectly venued.
 
 See In re Manville Forest Prod. Corp.,
 
 896 F.2d 1384, 1390-91 (2d Cir.1990);
 
 In re Commonwealth Oil Ref. Co.,
 
 596 F.2d 1239, 1241 (5th Cir.1979),
 
 cert. denied,
 
 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980);
 
 In re Washington, Perito & Dubuc,
 
 154 B.R. 853, 859 (Bankr.
 
 *793
 
 S.D.N.Y.1993). The location of Peachtree’s principal place of business presents a question of fact to be resolved by the bankruptcy court after considering all of the relevant facts and circumstances.
 
 Commonwealth Oil,
 
 596 F.2d at 1241 & 1245;
 
 In re Guarantee Acceptance Corp.,
 
 544 F.2d 449, 452 (10th Cir.1976);
 
 In re Great Lakes Hotel Assoc.,
 
 154 B.R. 667, 671 (E.D.Va.1992);
 
 see also Comm’r of Internal Revenue v. Soliman,
 
 506 U.S. 168, 174-75, 113 S.Ct. 701, 121 L.Ed.2d 634 (1993) (determination of a taxpayer’s principal place of business under the Internal Revenue Code is a fact-specific inquiry). Due to the factual nature of the inquiry, the bankruptcy court’s finding as to the location of a debtor’s principal place of business will not be disturbed unless it is found to be clearly erroneous.
 
 Commonwealth Oil,
 
 596 F.2d at 1247;
 
 Guarantee Acceptance Corp.,
 
 544 F.2d at 452; Bankr. R. 8013.
 

 Considerable portions of the parties’ briefs are devoted to whether the principal place of business of a limited partnership like Peachtree is the place where its management or supervisory decisions are made, or the place where the entity conducts its business on a day-to-day basis. The parties view that question as central because the bankruptcy court found in this case that Peachtree’s day-to-day operations during the venue period were conducted in Texas but that its management decisions were made in the Chicago area. In light of those findings, it appears that Peachtree has at least two important places of business, but § 1408(1) requires a choice as to which is the
 
 principal
 
 place of business. In analyzing the use of the same phrase in the Internal Revenue Code, the Supreme Court looked to the ordinary dictionary definition of the word “principal.” The Court found that a taxpayer’s “principal” place of business is the “ ‘most important, consequential, or influential’ ” place where he conducts business.
 
 Soliman,
 
 506 U.S. at 174, 113 S.Ct. 701 (quoting Webster’s Third New International Dictionary 1802 (1971)). In this case, then, we must consider whether the place where Peachtree’s major business decisions were made, or the place where its day-to-day operations were conducted, qualifies as the “most important, consequential, or influential” place where Peachtree conducted its business during the 180-day venue period.
 

 We begin with the Granader’s contention that the Supreme Court already resolved this issue in their favor in
 
 Royal Indemnity Co. v. American Bond & Mortgage Co.,
 
 289 U.S. 165, 169, 53 S.Ct. 551, 77 L.Ed. 1100 (1933), when the Court described a debtor’s principal place of business as the place “where [its] business is in fact transacted.” According to the Granaders, this meant that in the event of a conflict of the type we have here, courts must look to where the day-today operations of the business occur, rather than to where the debtor’s major business decisions are made. We agree with the lower courts, however, that
 
 Royal Indemnity
 
 does not actually address that question and thus is not controlling here.
 

 To begin with, the Supreme Court’s own description of the issue to be resolved in
 
 Royal Indemnity
 
 demonstrates that the question presented there was not the same as the one we face here:
 

 Has the location where a corporation maintained its main office and transacted most of its business ceased to be the principal place of business for the purposes of jurisdiction in bankruptcy if, during the greater portion of six months preceding the filing of the petition, the company’s assets and affairs were in [the] custody and control of equity receivers?
 

 289 U.S. at 166, 53 S.Ct. 551.
 
 [3]
 
 In addressing that issue, the Court took it as a given that the debtor (American Bond & Mortgage Co.) was a Maine corporation that had its principal place of business in Chicago. After being sued in the Northern District of Illinois by a group of creditors, American Bond consented to the appointment of a receiver, who continued to operate its business. Shortly thereafter, two groups of American Bond’s creditors initiated separate involuntary bankruptcies,
 
 *794
 
 the first in the Northern District of Illinois and the second in Maine. As the two groups then battled over the proper venue for the two proceedings, American Bond initiated its own voluntary bankruptcy in the Illinois court, which, according to the Supreme Court, “immediately entered” an “adjudication” on the voluntary petition. 289 U.S. at 166-67, 53 S.Ct. 551. The creditors who wished to proceed in Maine sought to have that adjudication vacated on the ground that the Illinois court lacked jurisdiction. They argued that once a receiver was appointed to operate the company, American Bond ceased to have its principal place of business in the Northern District of Illinois: “The claim is that the Bankruptcy Act refers to the place where the bankrupt is doing business, and not to a place where a business the company once owned is being conducted by some one else.”
 
 Id.
 
 at 168, 53 S.Ct. 551. The Supreme Court rejected that argument on the following grounds:
 

 The argument ignores the practical purpose of the statute as applied to such a situation. The decree in equity and its execution by officers of the court did not change the ownership of the assets or of the business. The corporation continued to have the only business owned before the appointment of receivers, though the actual conduct of its operations was for the time being vested in the court’s appointees. Its corporate existence and functions as a corporation continued. Whether its affairs were in the course of winding up or were being managed in the hope of restoration of full control to the corporate agencies is immaterial. Until a winding up had been effected the business formerly conducted by the company in Chicago continued to be the respondent’s business and not that of another, and the place where that business was conducted, whether by receivers or by the corporate officers, still remained the “principal place of business,” in the common acceptation of the phrase. In these days of corporate activity it is not unusual for a company chartered in one of the states to conduct most, if not all of its business in another state far removed from that of incorporation. Considerations of convenience no doubt prompted the Congress to permit the initiation of a bankruptcy in the state where the business is in fact transacted rather than that of the domicile, where often none is done.
 

 Id.
 
 at 168-69, 53 S.Ct. 551.
 

 It is evident, then, that the
 
 Royal Indemnity
 
 decision has little if anything to do with the issue presented here. The Court in that case assumed that the debtor corporation had its principal place of business in the Northern District of Illinois, presumably because its main office was in that district and the corporation transacted most of its business there as well, and proceeded to consider whether that remained the case after a receiver was appointed to operate the business.
 
 See Hamilton Gas Co. v. Watters,
 
 75 F.2d 176, 182 (4th Cir.1935) (citing
 
 Royal Indemnity
 
 on the receivership issue). When considered in the context of the issue presented and addressed, then, the Court’s reference to the place “where the business is in fact transacted” cannot be read as expressing a preference for the Granaders’ position here — that a partnership’s principal place of business is where its day-to-day operations are conducted, as opposed to where its major business decisions are made. The Court in
 
 Royal Indemnity
 
 was not required to choose between those competing locales. As a result, we cannot accept the Granaders’ contention that
 
 Royal Indemnity
 
 requires that we locate Peachtree’s principal place of business in the Southern District of Texas. Thus, in the absence of any controlling authority from the Supreme Court, we proceed to analyze the issue ourselves.
 

 The most comprehensive treatment we have found of the issue presented here is the Fifth Circuit’s discussion in
 
 In re Commonwealth Oil Ref. Co.,
 
 596 F.2d 1239 (5th Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). That case addressed a Chapter 11 venue provision that preceded § 1408, which only became effective in 1984, but it too provided for venue in the judicial district “where the debtor has ‘had its principal place of business or its principal assets for the preceding [six] months or for a longer portion thereof than in any other district.’ ”
 
 Id.
 
 at 1241 (quoting former Bankr.R. 116(a)(2)). As in this case, the parties in
 
 *795
 
 Commonwealth Oil agreed that the debtor’s principal assets were in Puerto Rico, where its physical plant was located. The debate between them focused on whether the debt- or’s principal place of business also was there, or whether it instead was in San Antonio, where the company maintained its executive offices and managed the Puerto Rico refining and petrochemical operations.
 
 Id.
 
 at 1241-44. In choosing between these two locales, the Fifth Circuit first reviewed the history of Chapter ll’s venue provision in order to aid its understanding of the phrase “principal place of business”:
 

 Prior to the adoption of the current Chapter XI venue provision in 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter XI cases to the corporation’s principal place of business. Chapter X of the Bankruptcy Act, on the other hand allowed for venue in both the district where the corporation maintains its principal place of business or its principal assets. Rule 116(a)(2) changed the Chapter XI venue provision to conform to Chapter X’s standards. The change is significant for at least two reasons. First, it sheds some doubt on the validity of old case law construing Chapter XI’s prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a debtor’s principal place of business is not necessarily at the same location as its principal assets.
 

 Id.
 
 at 1244-45 (footnotes omitted). The court observed that given these expanded venue options, “it is no longer necessary to choose between the places of production and management.”
 
 Id.
 
 at 1245. Although the location of a debtor’s production facilities is still relevant to the principal place of business inquiry, it is less significant than before “because the location of the debtor’s principal assets is now an independent basis of venue.”
 
 Id.
 
 In the end, although the principal place of business inquiry is primarily a factual one on which the bankruptcy court must be given considerable latitude, the Fifth Circuit found that it is likely the place where general operations are supervised.
 
 Id.
 
 at 1246-47. As such, the Fifth Circuit concluded that the bankruptcy court did not clearly err in finding that Commonwealth Oil’s principal place of business was in San Antonio, not Puerto Rico. Id. at 1247.
 

 Like a number of bankruptcy and district courts, we find
 
 Commonwealth Oil’s
 
 discussion of the issue persuasive.
 
 See Peachtree,
 
 206 B.R. at 920-21 (collecting decisions that have followed
 
 Commonwealth Oil
 
 in finding that an entity’s principal place of business is the place where its major business decisions are made);
 
 see also, e.g., In re Vienna Park Properties,
 
 120 B.R. at 327-29;
 
 In re Sundance Corp.,
 
 84 B.R. 699, 700-01 (Bankr.D.Mont.1988);
 
 In re Landmark Capital Co.,
 
 19 B.R. 342, 347 (Bankr.S.D.N.Y.),
 
 aff'd,
 
 20 B.R. 220 (S.D.N.Y.1982). We are in agreement with the Fifth Circuit that the “most important, consequential, or influential” place where a corporation or partnership does its business is likely to be the place where its management decisions are made.
 
 Soliman,
 
 506 U.S. at 174, 113 S.Ct. 701. This focus on the location of the entity’s primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations.
 
 Commonwealth Oil,
 
 596 F.2d at 1246;
 
 see also Capitol Motor Courts v. Le Blanc Corp.,
 
 201 F.2d 356, 359 (2d Cir.),
 
 cert. denied,
 
 345 U.S. 957, 73 S.Ct. 940, 97 L.Ed. 1378 (1953). As the bankruptcy judge aptly observed in this case:
 

 When a single asset real estate entity files a petition under chapter 11, the case is not likely to be about renegotiating the individual lease or deciding to increase rent $25.00 a month. The typical chapter 11 case for a single asset real estate entity is about raising new capital, renegotiating loan terms, or, if that cannot be done, attempting to “cram down” a plan on the secured creditors, or selling the asset. In determining where venue is proper in such a case, courts therefore look to where those persons who will make those key decisions are located.
 

 In re Peachtree Lane Assoc.,
 
 198 B.R. at 282;
 
 see also In re Great Lakes Hotel Assoc.,
 
 154 B.R. at 672 n. 3;
 
 In re Garden Manor
 
 As
 
 *796
 

 soc.,
 
 99 B.R. 551, 554-55 (Bankr.S.D.N.Y.1998). Judge Barliant recognized that there may be exceptions to this general rule, but he found that this particular single-asset Chapter 11 proceeding was no different from the typical case he had described.
 
 Peachtree Lane Assoc.,
 
 198 B.R. at 283.
 
 [4]
 
 The major business decisions in this case, according to the court’s undisputed factual findings, were made by Kemper personnel in Chicago or Long Grove, Illinois. Given those findings, it was not clearly erroneous for the bankruptcy court then to conclude that Peachtree’s principal place of business during the venue period was in the Northern District of Illinois.
 

 The Granaders nonetheless contend that
 
 Commonwealth Oil’s
 
 rationale is flawed because the Fifth Circuit there suggests that the phrase “principal place of business” in the more recent versions of the Chapter 11 venue provision, where it is accompanied by “principal assets,” has a different meaning than the identical phrase in the 1898 version. According to the Granaders, nothing in the legislative history or in the amended venue provisions themselves suggests that “principal place of business” was intended to mean, in the presence of “principal assets,” anything other than what it meant when the phrase stood alone. The Granaders’ argument is premised, of course, on the assumption that the phrase had a clearly established meaning in the venue provision’s earlier incarnation — that is, that it was consistently interpreted by the courts to mean the location of the debtor’s production facilities or its day-to-day operations, rather than the location of its executive offices. The Granaders recognize that this assumption underlies their argument, but they point to the Supreme Court’s
 
 Royal Indemnity
 
 decision as proof that the assumption is a valid one. But as we explained previously, the Supreme Court was not required to choose between two such competing locales in
 
 Royal Indemnity.
 
 The Court there addressed only whether the appointment of a receiver to operate a failing business meant that the debtor ceased to conduct any business in the place that previously had qualified as its principal place of business.
 
 See Royal Indemnity,
 
 289 U.S. at 167-68, 53 S.Ct. 551. And if their preferred interpretation of
 
 Royal Indemnity
 
 is rejected, the Granaders’ argument necessarily founders, for they are unable to demonstrate that “principal place of business” had an established meaning prior to the addition of “principal assets” to the Chapter 11 venue provision in 1973. Indeed, as the Fifth Circuit observed in
 
 Commonwealth Oil,
 
 before adoption of the amended venue provision,
 

 the courts were divided on the question whether a debtor’s principal place of business is located in the district where the debtor maintains its general executive offices or in the district where the debtor operates its production facilities. Although all courts agreed that the location of a debtor’s principal place of business is a question of fact, either production or management facts were emphasized, depending on the circuit’s preference.
 

 596 F.2d at 1245 (citations omitted). Thus, it is not so much that the same phrase — “principal place of business” — took on a different meaning after “principal assets” was added to the Chapter 11 venue provision; rather, the addition of that alternative venue possibility obviated the earlier need to choose between two equally plausible locations.
 
 See id. As
 
 a result, neither
 
 Commonwealth Oil
 
 nor our decision today violates the rule of statutory construction on which the Granaders rely — that the identical phrase in a prior statute and in a later amendment are to be given the same meaning absent some indication to the contrary in the amended statute or its legislative history.
 
 E.g., McElroy v. United States,
 
 455 U.S. 642, 651 n. 14, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982).
 

 
 *797
 
 As an alternative to
 
 Commonwealth Oil,
 
 the Granaders ask us to follow the Tenth Circuit’s decision in
 
 In re Guarantee Acceptance Corp.,
 
 544 F.2d 449 (10th Cir.1976), which they say looks toward the location of the debtor’s asset in a single asset real estate ease. Guarantee Acceptance involved a condominium townhouse project that was located in California, but the owner of the project was an Oklahoma corporation that maintained its corporate headquarters in that state. The Tenth Circuit concluded that a bankruptcy court in Oklahoma did not clearly err in locating the debtor’s principal place of business in California, but contrary to what the Granaders intimate here, the court did not adopt a hard and fast rule to be applied in every single asset case. Rather, the Tenth Circuit explained:
 

 [TJhe corporate headquarters and offices are not necessarily the principal place of business of a corporation. The determination to be made is one of fact as to where, in the main, the corporation does its business. The factors set forth herein were before the Oklahoma court, and that court determined [the debtor’s] principal place of business was not in Oklahoma. We are not persuaded the court’s determination was clearly erroneous.
 

 Id.
 
 at 452 (citations omitted);
 
 see also In re Great Lakes Hotel Assoc.,
 
 154 B.R. at 672. We do not read Guarantee Acceptance as setting forth the bright-line legal rule the Granaders advocate. The Tenth Circuit simply found no clear error on the facts in that case, as we find no clear error on the facts of this one.
 

 For all of these reasons, then, we find that Peachtree’s Chapter 11 proceeding was properly filed in the Northern District of Illinois.
 

 III.
 

 The other issue raised by the Granaders, although garnering less attention in their brief than the venue question, is also an important one — whether the lower courts properly found that the Granaders lost their right to a jury trial under the Seventh Amendment when they filed counterclaims which stood as a proof of claim in Peachtree’s bankruptcy. Peachtree filed its adversary complaint on August 31, 1994, and Peachtree sought in that complaint a declaration of the parties’ rights under the easement agreement as well as injunctive relief. On September 12,1994, the Granaders answered the adversary complaint and submitted a jury demand, twenty-six affirmative defenses, a six-count “conditional” counterclaim, and a motion to dismiss the adversary complaint or to transfer venue.
 
 [5]
 
 The following day, the Granaders filed a motion to withdraw the reference, arguing that due to their jury demand, the district court rather than the bankruptcy court should preside over the adversary proceedings. While the Granad-ers’ motions to dismiss or to transfer and for withdrawal of the reference were pending, Peachtree moved to dismiss the counterclaims because the Granaders had not filed a claim in the bankruptcy proceedings prior to .the September 6, 1994 bar date. The Gra-naders responded that they had never received notice of the bar date, and they therefore asked the bankruptcy judge to extend the date to enable them to maintain their counterclaims. The Granaders’ motion asked in the alternative that the bar date be extended to encompass their previously-filed counterclaims, or that they be given seven additional days in which to file a proof of claim. By its order of October 25, 1994, the bankruptcy court denied Peachtree’s motion to dismiss the counterclaims while granting the Granaders’ motion to enlarge the bar date to encompass those claims. The court subsequently explained at an October 31, 1994 hearing that the Granaders’ counterclaims would stand as a proof of claim against the estate in Peachtree’s bankruptcy. In light of that claim, the bankruptcy court then struck the Granaders’ jury demand. Shortly thereafter, the district court denied the Granaders’ motion for withdrawal of the reference, finding that the Granaders were not entitled to a jury trial because they had
 
 *798
 
 filed a claim against the bankruptcy estate.
 
 Peachtree Lane Assoc., Ltd. v. Granader,
 
 175 B.R. 232, 235-36 (N.D.Ill.1994). The Granaders now challenge that decision here. Whether the Granaders were entitled to a jury trial on Peachtree’s adversary complaint and on their own counterclaims is a legal question that we consider de novo.
 
 In re Hallahan,
 
 936 F.2d 1496, 1502 (7th Cir.1991).
 

 Like the district court, we find this aspect of the Granaders’ appeal controlled by
 
 Langenkamp v. Culp,
 
 498 U.S. 42, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (per curiam). In that case, the Chapter 11 trustee initiated adversary proceedings against a number of creditors to recover what the trustee alleged were avoidable preference payments to those' creditors. At the time the adversary proceeding was filed, certain of the creditors had filed proofs of claim against the bankruptcy estate while other creditors had not. The bankruptcy court conducted a bench trial with respect to all of the creditors, however, and found for the trustee. The Tenth Circuit reversed, holding that all of the creditors, including those who previously had filed claims against the estate, were entitled to a jury trial on the preference action.
 
 Id.
 
 at 43-44, 111 S.Ct. 330. On certiorari, the Supreme Court concluded that only those creditors who had not filed claims against the bankruptcy estate were entitled to a jury trial on the preference question. Those creditors who had filed proofs of claim, the Court found, were not entitled to a jury trial because by filing a claim, those creditors had brought themselves within the equitable jurisdiction of the bankruptcy court:
 

 In
 
 Granfinanciera
 
 [S.A.
 
 v. Nordberg,
 
 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)], we recognized that by filing a claim against a bankruptcy estate the creditor triggers the process of “allowance and disallowance of claims,” thereby subjecting himself to the bankruptcy court’s equitable power. 492 U.S., at 58-59, and n. 14, 109 S.Ct., at 2799-2800, and n. 14 (citing
 
 Katchen [v. Landy,
 
 382 U.S. 323, 336, 86 S.Ct. 467, 476, 15 L.Ed.2d 391 (1966)]). If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor’s claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court’s
 
 equity jurisdiction.
 
 As such, there is no Seventh Amendment right to a jury trial. If a party does not submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial. [ ] Accordingly, “a creditor’s right to a jury trial on a bankruptcy trustee’s preference claim depends upon whether the creditor has submitted a claim against the estate.”
 

 Langenkamp,
 
 498 U.S. at 44-45, 111 S.Ct. 330 (emphasis in original; additional citations omitted);
 
 see also Granfinanciera,
 
 492 U.S. at 58-59 & n. 14, 109 S.Ct. 2782;
 
 Billing v. Ravin, Greenberg & Zackin, P.A.,
 
 22 F.3d 1242, 1248-49 (3d Cir.),
 
 cert. denied,
 
 513 U.S. 999, 115 S.Ct. 508, 130 L.Ed.2d 416 (1994);
 
 In re Hallahan,
 
 936 F.2d at 1504-05.
 

 Langenkamp
 
 clearly means that the Granaders were not entitled to a jury trial in this case. By asking the bankruptcy court to extend the bar date either to encompass their counterclaims or to enable them to file a separate proof of claim, the Granaders signaled their intention to make a claim against Peachtree’s bankruptcy estate. And once the bankruptcy court granted the request, the court properly considered the Granaders’ counterclaims as representing a proof of claim. Having requested an enlargement of the bar date, the Granaders cannot now be heard to complain that they filed no proof of claim against the bankruptcy estate. In these circumstances, we agree with the bankruptcy and district courts that the Granaders made a claim against the bankruptcy estate, thereby bringing this case comfortably within the scope of
 
 Langenkamp. Peachtree Lane Assoc.,
 
 175 B.R. at 236.
 
 [6]
 
 Under that decision, having submitted
 
 *799
 
 a claim against the bankruptcy estate, the Granaders no longer were entitled to a jury trial on Peachtree’s adversary complaint or on their own counterclaims.
 

 The Granaders attempt to avoid Langenkamp’s holding in two ways. First, they contend that they only made a claim against the bankruptcy estate once they were sued by Peachtree in the adversary complaint, not prior to the filing of that complaint, as in Langenkamp. Second, the Granaders emphasize that their counterclaims were expressly designated as “conditional” and that they did not forfeit their right to a jury trial by making such a conditional claim. Neither argument is persuasive. On the first, nothing in
 
 Langenkamp
 
 suggests that it makes any difference whether the filing of the adversary proceeding precedes or follows the submission of a claim against the bankruptcy estate. In either case, the submission of the claim still would “trigger! ] the process of ‘allowance and disallowance of claims,’ ” thereby subjecting the claimant to the bankruptcy court’s equitable jurisdiction.
 
 Langenkamp, 498
 
 U.S. at 44, 111 S.Ct. 330 (quoting Gr
 
 anfinanciera,
 
 492 U.S. at 58, 109 S.Ct. 2782);
 
 see also Travellers Int’l AG v. Robinson,
 
 982 F.2d 96, 100 n. 14 (3d Cir.1992) (rejecting attempt to distinguish
 
 Langenkamp
 
 on the same basis),
 
 cert. denied,
 
 507 U.S. 1051, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993);
 
 In re Hooker Investments, Inc., L.J.,
 
 937 F.2d 833, 838-39 (2d Cir.1991) (rejecting argument that a defendant in the debtors’ adversary action should be entitled to delay filing a proof of claim until the resolution of the adversary action so as not to deprive the defendant of its right to a jury trial, under
 
 Langenkamp); In re Glen Eagle Square, Inc.,
 
 132 B.R. 106, 112 (Bankr.E.D.Pa.1991),
 
 aff'd,
 
 132 B.R. 115 (E.D.Pa.1991). Nor are we persuaded that the “conditional” designation attached by the Granaders to their counterclaims serves to preserve their right to a jury trial. We agree with the bankruptcy and district courts that that designation is of no moment in these circumstances.
 
 See Travellers Int’l,
 
 982 F.2d at 99-100 (creditor who has filed a contingent claim couched in “protective language” still “has submitted to the bankruptcy court’s equitable jurisdiction and waived any Seventh Amendment right to a jury trial”).
 

 IV.
 

 For the foregoing reasons, we find that venue for Peachtree’s Chapter 11 bankruptcy petition was proper in the Northern District of Illinois, as that was the location of Peach-tree’s principal place of business for the 180-day period preceding the filing of its bankruptcy. We- also conclude that by filing counterclaims that in the circumstances of this case served as a proof of claim against Peachtree’s bankruptcy estate, the Granad-ers submitted themselves to the equity jurisdiction of the bankruptcy court and thereby lost their right to a jury trial of the issues raised in the adversary proceeding and their own counterclaims. We commend Judges Barliant and Castillo for their adept handling of this hard-fought ease.
 

 Affirmed.
 

 [1]
 

 . Western National personnel in California did most of the accounting and financial reporting work for the property.
 

 [2]
 

 . Having found venue proper in the Northern District of Illinois, Judge Bariiant then considered and denied the Granaders’ motion to transfer the adversary proceeding to the Southern District of Texas.
 
 See
 
 28 U.S.C. § 1412. The Granaders have not pursued the transfer issue in this appeal.
 

 [3]
 

 . The statute at issue in
 
 Royal Indemnity
 
 provided jurisdiction to " 'adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile’ within the court's territorial jurisdiction 'for the preceding six months, or the greater portion thereof.’ ’’
 
 Id.
 
 at 167-68, 53 S.Ct. 551 (quoting 11 U.S.C.A. § 11 (1933)).
 

 [4]
 

 . As Judge Barliant explained it:
 

 It is unfortunately true that the simple adversary proceeding involving a few parking spaces and an easement has become the principal activity in this case. Nevertheless, the core of this bankruptcy case is not the Granaders’ fanatic defense of their right to trespass, but the sale of the property and payment of creditors. That was achieved through the vehicle of a chapter 11 plan. All the negotiations, judgments, and decisions leading to that plan were made, on the Debtor's side, by people whose offices are in this district.
 

 Id.
 

 [5]
 

 . The Granaders styled the counterclaims as “conditional” because they intended to bring them only if their motion to dismiss or to transfer was denied. The Granaders stated that by filing the counterclaims, they did not intend to waive arguments advanced elsewhere relating to jurisdiction, venue, and their right to a jury trial.
 

 [6]
 

 . In light of our conclusion that the Granaders’ counterclaims were properly viewed as standing
 
 *799
 
 as a proof of claim in the circumstances of this case, where the Granaders had requested an extension of the bar date to encompass their counterclaims or to enable them to file a proof of claim, we need not consider the Granaders’ argument that the filing of a compulsory counterclaim in an adversary proceeding would not deprive them of their right to a jury trial. The district court expressly declined to decide whether any of the Granaders’ counterclaims were compulsory under the rules applicable in bankruptcy cases
 
 (Peachtree Lane Assoc.,
 
 175 B.R. at 237 n. 7), and the compulsory versus permissive question has not been briefed to us in this appeal. The Third Circuit, in a
 
 pre-Langenkamp
 
 decision, held that the defendant in an adversary proceeding does not waive its right to a trial by jury by filing a compulsory counterclaim.
 
 Beard v. Braunstein,
 
 914 F.2d 434, 442 (3d Cir.1990). A number of lower courts have since disagreed, however, explaining that a waiver analysis is inappropriate under the Supreme Court's
 
 Langenkamp
 
 and
 
 Granfinanciera
 
 decisions.
 
 See, e.g., Peachtree Lane Assoc.,
 
 175 B.R. at 236-37;
 
 In re Hudson,
 
 170 B.R. 868, 874-75 (E.D.N.C.1994);
 
 In re Americana Expressways, Inc.,
 
 161 B.R. 707, 714 n. 12 (D.Utah 1993);
 
 In re Allied Cos., Inc.,
 
 137 B.R. 919, 924-25 (S.D.Ind.1991);
 
 In re Schwinn Bicycle Co.,
 
 184 B.R. 945, 953 (Bankr.N.D.Ill.1995).