In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 00-4052 and 00-4100

SNA NUT COMPANY,

*Plaintiff-Appellee and Cross-Appellant,*

*v.*

THE HÄAGEN-DAZS COMPANY, INC.,

*Defendant-Appellant and Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 2820—**Harry D. Leinenweber**, *Judge.*

ARGUED NOVEMBER 1, 2001—DECIDED SEPTEMBER 9, 2002

Before FLAUM, *Chief Judge*, and MANION and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* SNA Nut Company ("SNA"), a debtor in Chapter 11 bankruptcy, sued Häagen-Dazs ("HD") for the alleged breach of five supply contracts. Following trial in an adversary proceeding, the bankruptcy court issued proposed findings of fact and conclusions of law. Based on these proposed findings and conclusions, the district court entered judgment in favor of SNA. On appeal we modify the judgment of the district court and affirm the judgment as modified.

## I. Background

Beginning in the 1980s, SNA manufactured and supplied nut products to HD for use in the manufacture of ice cream, and by 1994, SNA was HD's exclusive supplier of nut products. The products that SNA sold to HD were manufactured according to unique recipes that were developed jointly by SNA and HD. HD would purchase the nut products pursuant to supply contracts, agreeing to purchase a set volume of nut products over a set period of time for a set price. HD's purchasing director, Clifford Stecker until January 1994 and Richard Reider starting in 1994, negotiated these supply contracts with SNA's outside broker, Hank Rich. After agreeing on the quantity, price, and duration, SNA would send to HD a sales contract setting forth the terms of their agreement. HD would respond by sending back to SNA a purchase order containing identical terms. Neither party would sign the other's document. The following five supply contracts are the subject of this litigation:

| Contract for: | Amount (Pounds) | Duration of Contract | Price/Pound |
|---|---|---|---|
| Diced Almonds | 630,000 | 10/4/93 - 8/31/94 | $3.85 |
| Diced Walnuts | 121,020 | 11/29/93 - 9/30/94 | $4.10 + .02/month or $3.95 |
| Macadamia Brittle | 325,000 | 6/2/94 - 12/31/94 | $2.735 |
| Macadamia Fines | 35,000 | 6/12/94 - 12/31/94 | $2.735 |
| Macadamia Minis | 200,000 | 6/9/94 - 12/31/94 | $2.735 |

HD would not take delivery of an entire order at any one time. Rather, the managers of HD's individual plants

would notify SNA when and how much nut product they wanted "to pull." Although SNA would not remind HD to schedule orders, SNA would send HD a monthly "contract balance" report, which recited the terms of the contracts between the parties and showed how much of each product had been pulled under each contract as of the date of the report.

In March 1994, several of SNA's creditors filed an involuntary bankruptcy petition against it, and SNA then converted the petition into a voluntary bankruptcy under Chapter 11 of the Bankruptcy Code. Due to financial problems associated with the bankruptcy, Hank Rich notified HD in March 1994 that SNA was temporarily unable to process almonds and suggested that HD secure an alternate almond supplier. Later that month, SNA expressed to HD that it was willing and able to resume fulfilling its obligations under the diced almonds contract. Three months later, Reider sent Rich a letter explaining that during the months of March, April, and May, HD had secured 217,950 pounds of almonds from alternate suppliers per Rich's suggestion. He further requested that the contract be reduced to reflect this difference, but SNA refused to do so.

In January 1995, the bankruptcy court confirmed a Chapter 11 reorganization plan for SNA. One month later, SNA filed a lawsuit against HD to collect payments that HD allegedly owed it for pecan and other nut products (the "first adversary complaint"), which SNA had delivered to HD after the filing of their bankruptcy petition. HD then filed a counterclaim in that adversary action. Additionally, HD moved for leave to file a late proof of claim in SNA's Chapter 11 bankruptcy case, and the bankruptcy court granted HD's request.

Then, on September 6, 1996, SNA filed the adversary action at issue in this appeal, alleging that HD breached

the five aforementioned supply contracts (the "second adversary complaint"). One week later, HD filed its proof of claim in SNA's Chapter 11 case, and on September 27, HD filed a timely jury demand in the second adversary action. Subsequently, the bankruptcy court disallowed HD's proof of claim in SNA's Chapter 11 bankruptcy case with prejudice, approved a settlement agreement between the parties in the first adversary action, and held that the settlement in that proceeding did not release SNA's claims against HD in the second adversary action.

Prior to trial in the second adversary proceeding, SNA filed a motion to strike HD's jury demand, arguing that HD had consented to the equitable jurisdiction of the bankruptcy court by filing a proof of claim in the bankruptcy case, and the bankruptcy court entered an order striking the jury demand. HD then sought an immediate appeal to the district court, but the district court concluded that an immediate appeal would not advance the litigation as trial was already set to begin shortly in the bankruptcy court. Thus, the district court denied HD's motion and returned the case to the bankruptcy court. Back before the bankruptcy court, HD filed a motion to reconsider the denial of its jury demand, and SNA filed a renewed motion to strike the jury demand. After considering the issue a second time, the bankruptcy court again granted SNA's motion to strike HD's jury demand.

The bankruptcy court thereafter entered summary judgment in SNA's favor as to the existence of three of the five supply contracts in question and on a majority of HD's fifteen affirmative defenses.

After considering all of the evidence presented at the subsequent bench trial, the bankruptcy court concluded that the evidence (1) established the terms of the remaining two supply contracts in question, thus finding that all five supply contracts existed; (2) proved that HD

breached all five contracts; (3) showed that HD was partially excused from performance under the contract for diced almonds but was not otherwise excused; and (4) demonstrated that HD was liable to SNA for damages in the amount of $921,978.49 plus prejudgment interest. The bankruptcy court made its proposed findings of fact and conclusions of law accordingly.

HD filed objections with the district court to many of the bankruptcy court's proposed findings and summary judgment orders entered prior to trial. In response, SNA objected to HD's objections and filed a motion to strike HD's objections on multiple grounds.

After undertaking a *de novo* review of the bankruptcy court's proposed findings, the district court entered a Memorandum Opinion and Order adopting all but two of the findings proposed by the bankruptcy court. Relevant to this appeal and contrary to the bankruptcy court's proposed findings, the district court concluded that HD was excused from performance under the diced almonds contract for a longer period of time than the bankruptcy court concluded, and therefore, the district court reduced SNA's damage award with respect to the diced almonds contract.

On appeal, HD argues that the district court incorrectly concluded that, by filing a proof of claim against SNA in the bankruptcy court, HD waived its right to a jury trial in the second adversary proceeding. Second, HD claims that it was an abuse of discretion to fail to consider its alleged reliance on misleading and inaccurate inventory information that was sent to it by SNA's outside broker Rich. Third, HD claims that it was error to exclude its "mend-the-hold" defense. Fourth, HD claims that the district court erred in calculating damages. Finally, HD claims that the district court erred in awarding SNA prejudgment interest. On cross appeal, SNA claims

that the district court erred when it modified the bankruptcy court's proposed finding as to the amount of damages SNA sustained for HD's breach of the diced almonds contract.

## II. Analysis

### *A.  Right to a Jury Trial*

First, HD claims that it did not waive its right to a jury trial. Whether there was a jury waiver is a legal question that we review *de novo*. *See In re Peachtree Lane, Assocs.*, 150 F.3d 788, 798 (7th Cir. 1998). To determine whether a party has submitted itself to the equitable jurisdiction of the bankruptcy court, the relevant inquiry is whether the party has submitted a claim against the bankruptcy estate, thereby subjecting itself to the bankruptcy court's equitable power to allow or disallow claims. *See Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 59 n.14, 109 S. Ct. 2782, 106 L. Ed. 26 (1989). Once a party has triggered this process of allowance and disallowance of claims, that party has subjected itself to the bankruptcy court's equitable jurisdiction and thus can no longer demand a right to a trial by jury. *See Peachtree Lane*, 150 F.3d at 798. In *Peachtree Lane*, we stated

> nothing in [the relevant Supreme Court precedent] suggests that it makes any difference whether the filing of the adversary proceeding precede[d] or follow[ed] the submission of a claim against the bankruptcy estate. In either case, the submission of the claim still would trigger the process of allowance and disallowance of claims, thereby subjecting the claimant to the bankruptcy court's equitable jurisdiction.

*Id.* at 799 (quotations omitted).

In this case, HD filed a proof of claim in SNA's bankruptcy case on September 13, 1996, and two weeks later,

HD filed a jury demand in the second adversary action. Subsequently, on December 4, 1996, the bankruptcy court disallowed HD's proof of claim with prejudice when it approved a settlement in the first adversary proceeding. We conclude that HD's actions were sufficient to consent to the equitable jurisdiction of the bankruptcy court because HD triggered the process of allowance and disallowance of claims when it filed its proof of claim on September 13. *See id.*

HD makes several arguments on appeal contending that under the present circumstances it retained its right to a trial by jury. We, however, find none of these arguments persuasive. For example, HD cites to several cases where creditors properly withdrew their proof of claim filings, pursuant to Bankruptcy Rule 3006, and thus retained their right to request a jury. *See, e.g.*, *Smith v. Dowden*, 47 F.3d 940, 943 (8th Cir. 1995); *In re 20/20 Sport, Inc.*, 200 B.R. 972, 979-80 (Bankr. S.D.N.Y. 1996). These cases, however, are unlike the present appeal because in *Dowden* and *20/20 Sport* the creditors properly withdrew their proof of claim filings pursuant to Rule 3006, whereas here HD never withdrew its proof of claim filing. Rather, the court specifically ordered as part of the parties' settlement agreement in the first adversary proceeding that HD's proof of claim be disallowed with prejudice and therefore, cases such as *Dowden* are easily distinguishable from the case at bar.

### B. Misleading Inventory Reports

Second, HD claims that it was an abuse of discretion to reject its argument that it detrimentally relied on misleading and inaccurate inventory information sent to it by SNA's outside broker Rich. According to HD, these reports showed that SNA's inventory was minimal or nonexistent and that SNA was no longer producing any

nut products. Thus, HD asserts that it was in error to grant summary judgment on HD's equitable estoppel defense; or alternatively, that the district court erred in failing to consider HD's defense that SNA engaged in bad faith. Further, HD claims that it was error to find that it failed to preserve its "mend-the-hold" defense in the pretrial order.[1]

### 1.  Equitable-Estoppel and Bad-Faith Defenses

We find HD's equitable estoppel defense waived because at no time in HD's two-page statement of its equitable estoppel defense before the bankruptcy court did HD theorize that as a basis for this defense that it relied on misleading weekly inventory reports. *See In re Kroner*, 953 F.2d 317, 319-20 (7th Cir. 1992). Rather, in the pretrial order, HD claimed equitable estoppel as a defense because SNA led HD to believe through *silence* that SNA would not enforce the contracts. Further, HD's alternative argument that it was error to fail to consider whether SNA acted in bad faith is also waived because the first time HD attempts to support this theory (by claiming that it relied on misleading weekly inventory reports) is on appeal. *See id.*

In any event, even if HD had preserved these two arguments in the pretrial order, we would still be unpersuaded by HD's appeal as we find no clear error in the factual determinations accepted by the district court. *See Thomas v. General Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002). Based on the recommended findings the district court expressly found that SNA maintained the ability to meet HD's contractual requirements in

---

[1] The particulars of the "mend-the-hold" defense are irrelevant to this appeal as we find this affirmative defense waived.

October 1994, thereby implicitly rejecting HD's argument that certain weekly inventory reports from that time period suggested otherwise. This finding is supported by the testimony of Rich, who explained that the reports referenced by HD only reflected finished goods in inventory that were boxed, tested by outside microbiological laboratories, stamped, and ready for delivery. These reports, however, did not reflect unfinished product or product delivered on the date of the report. As HD has shown no clear error, we decline to reverse the district court on appeal.

## 2. *"Mend-the-Hold" Defense*

HD also claims that it preserved its "mend-the-hold" defense in the pretrial order. We have previously noted that a pretrial conference and a pretrial order are vital parts of the procedural scheme created by the Federal Rules of Civil Procedure. *See Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443 (7th Cir. 1995). Further, "[b]ecause the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superceding the pleadings and establishes the issues to be considered at trial." *Id.* at 1443-44. Moreover, the whole purpose of pretrial conferences and orders "is to clarify the real nature of the dispute at issue[;] a claim or theory not raised in the pretrial order should not be considered by the fact-finder." *Id.* at 1444 (quotations omitted). While this result may seem harsh, pretrial orders help to prevent protracted litigation due to changing theories and arguments such as those that we are encountering in this case.

HD claims that it preserved its "mend-the-hold" defense in paragraph 25 of the pretrial order and in its fourth affirmative defense. Paragraph 25 of HD's Pretrial Order Statement of Uncontested Issues of Fact provides:

> Whether SNA filed a motion to dismiss the counter-claim in the first adversary and asserts that the alleged pecan contract was rejected by operation of the plan of reorganization, that no contract was created, or in the alternative, that the alleged contract was a series of divisible installment contracts based on separate purchase orders and invoices.

Nowhere in this paragraph did HD preserve a "mend-the-hold" defense. Further, HD's fourth affirmative defense in its answer mentions judicial estoppel, not a "mend-the-hold" defense. *See Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 363 (7th Cir. 1990) (distinguishing between judicial estoppel and the "mend-the-hold" defense). In any event, even if HD had mentioned a "mend-the-hold" defense in its affirmative defenses, as we explained above, a pretrial order supercedes the pleadings and a defense not raised in a pretrial order is deemed waived. *See Gorlikowski*, 52 F.3d at 1444.

### C.  Failure to Mitigate

Next, HD argues that it was error to deny HD's affirmative defense of failure to mitigate. HD argues that SNA built too much inventory and could have reduced its damages by stopping production and by selling the raw materials it already had in stock. The following evidence was presented: SNA offered testimony that established that SNA stopped manufacturing all HD nut products in November 1994, following HD's refusal to pull any nut products under the contracts at issue. Further, five of SNA's employees testified regarding their efforts to resell the HD nut products. They explained that they contacted every SNA customer in an attempt to resell the nut products, that they contacted companies who were not customers, and that they enlisted outside brokers and distributors. When some of the nut products became

too old for human consumption, they sold the nut products to animal feed manufactures. Finally, the SNA employees testified that they were forced to destroy nut products they could not sell as the products became rancid. The aforementioned evidence is sufficient to show that SNA did mitigate damages.

### D.  Damages

#### 1.  Raw Almonds and Raw Walnuts

HD offered no evidence regarding damages. In contrast, multiple witnesses testified in the bankruptcy court in support of SNA's damage claim. The witnesses established that there were three components to SNA's damages: (1) the contracted nut products that SNA had finished processing pursuant to HD's unique recipes and which HD failed to pull; (2) contracted nut products SNA did not finish processing because HD stopped pulling the nut products; and (3) the raw almonds and walnuts that SNA bought during the 1993 harvest to perform its obligations under the HD contracts that HD never pulled and that had declined in value by the end of the contracts in 1994. The third component is the focus of HD's next argument on appeal.

With respect to the third component, the bankruptcy court found that SNA had bought the raw nuts at the end of the 1993 harvest to fulfill its obligations to HD under the contracts, and between 1993 and 1994, the price of the raw nuts fell. When HD failed to pull these raw nuts, SNA was left holding them. Thus, when SNA eventually resold the raw nuts to other customers, SNA lost profits because the price of the nuts had declined. Therefore, SNA calculated its damages by determining its loss in profit per pound of raw nuts, and adding to that amount the additional costs it incurred from having to hold and store the raw materials for longer than ex-

pected. The bankruptcy court agreed with SNA's calculations, and the district court adopted the bankruptcy court's proposed finding.

On appeal, HD claims that the raw materials damages calculations were in error. Specifically, HD claims that SNA should not have been awarded damages for raw almonds and raw walnuts because such damages were not within HD's reasonable contemplation and because SNA failed to establish the value of the raw nuts. We, however, "are inclined to recognize the considerable discretion entrusted to the district court in calculating damages, even in cases where the court has adopted the findings of the prevailing party. If the adopted findings are sufficient to permit appellate review and are not clearly erroneous, the appellate court must affirm the judgment." *Hagge v. Bauer*, 827 F.2d 101, 109 (7th Cir. 1987).

First, HD contends that SNA failed to prove its damages to a reasonable certainty. The Supreme Court has stated that "[c]ertainty as to the amount [of damages] goes no further than to require a basis for a reasoned conclusion." *Palmer v. Connecticut Railway & Lighting Co.*, 311 U.S. 544, 561, 61 S. Ct. 379, 85 L. Ed. 2d 336 (1941). When HD breached its obligations under the diced almonds and diced walnuts contracts, it left SNA with 187,029 pounds of unprocessed raw almonds and 6,411 pounds of unprocessed raw walnuts. SNA suffered a loss on those raw materials when the price fell between the fall of 1993 and the fall of 1994 because no one was willing to pay the price that HD had previously contracted to pay. In order to determine their lost profits, SNA determined the change in the value of the nuts by looking at the difference in cost to procure the raw nuts between 1993 and 1994. SNA then multiplied this difference by the amount of raw nuts it had had in its inventory for HD and added to that amount the additional storage

costs it incurred. We believe that the above calculations are reasoned conclusions.

Further, with regard to whether such damages were within HD's reasonable contemplation, Reider, HD's purchasing director, testified that he knew that nuts were harvested once a year and that a buyer had to buy during the harvest to lock in a supply of nuts. Thus, Reider would have known that SNA bought the raw almonds and walnuts in question in the fall of 1993 to fulfill its obligations to HD in 1994. Because Reider, as purchasing director, should have known the quantity terms of its supply contracts with SNA and that the price of nuts can fluctuate, we see no reason why the lower courts could not have inferred that the amount of damages were within HD's reasonable contemplation. Thus, we find no clear error in the damages calculations for raw almonds and raw walnuts.

## 2.  Diced Almonds Contract

Both parties appeal the district court's calculation of damages on the diced almonds contracts. We review disputes over the actual amount of damages awarded for an abuse of discretion. *See FTC v. Febre*, 128 F.3d 530, 534 (7th Cir. 1997). The bankruptcy court concluded that HD could subtract one 90,000 pound order of diced almonds from SNA's damages calculation because SNA's outside broker, Rich, had told HD that SNA was temporarily unable to fulfill the diced almonds contract. Subsequently, the district court rejected the bankruptcy court's proposed finding and concluded that HD was excused from performing on the diced almonds contract through June 1994, because until June, no one had communicated to HD that SNA could resume fulfilling its obligations. Based on a letter written by Reider in June 1994, the district court concluded that HD had pur-

chased 218,000 pounds of diced almonds from alternative sources. Thus, the district court determined that HD could reduce its total obligation under the almonds contract by 218,000 pounds, and consequently, it reduced SNA's damages award accordingly.

On appeal, SNA argues that the district court clearly erred when it found that SNA failed to inform HD that it could resume supplying almonds until June 1994. We agree. In fact, the record contains memoranda between Rich and Reider, which clearly reveal that SNA could resume supplying HD with almonds as early as late March 1994. Thus, we modify the district court's finding with respect to the reduction in the diced-almonds contract to be consistent with the proposed findings of the bankruptcy court and will modify the judgment to provide that HD is liable to SNA for damages in the amount of $379,532.79 for its breach of the diced-almonds contract.

### E.  Prejudgment Interest

With regard to the judgment, HD claims that SNA is not entitled to prejudgment interest. The Illinois Interest Act provides that a creditor shall be allowed interest at the rate of five percent per annum for all monies after they become due on any instrument of writing. *See* 815 ILCS § 205/2. We will review an award of prejudgment interest for an abuse of discretion. *See Singer Co. v. Skil Corp.*, 803 F.2d 336, 341 (7th Cir. 1986).

First, HD argues that SNA's claims are not based on instruments of writing. The record, however, established that the five sales contracts between HD and SNA constitute "instruments of writing" under the Illinois Interest Act because the written sales contracts that SNA sent to HD satisfied the UCC Statute of Frauds and thus constituted enforceable instruments of writing. *See* 810 ILCS 5/2-201; *see also Hennessy v. Schmidt*, 583 F.2d 302,

307-08 (7th Cir. 1978); *L.W. Foster Sportswear Co. v. Goldblatt Bros. Inc.*, 356 F.2d 906, 910 (7th Cir. 1966).

Second, HD claims that SNA's damages were not easily determined. Specifically, HD argues that because damages could not be ascertained by looking at the contracts, SNA's damages were not easily determinable and prejudgment interest was inappropriate. This argument lacks merit because as we have previously explained damages can be easily determinable "even where the amount due requires legal ascertainment." *Fabe v. Facer Ins. Agency, Inc.*, 773 F.2d 142, 146-47 (7th Cir. 1985). Consequently, SNA's damages were easily determinable even though the district court in this case was required to ascertain the amount due, and therefore, the district court did not abuse its discretion by awarding prejudgment interest to SNA.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is modified to provide that judgment is entered in favor of SNA Nut Company and against Häagen-Dazs in the total amount of $921,978.49 ($379,532.79 for the almonds contract; $155,862.70 for the walnuts contract; $320,353.80 for the macadamia-brittle contract; $19,453.60 for the macadamia-fines contract; and $46,775.60 for the macadamia-miniscontract) plus prejudgment interest at the rate of 5%. As so MODIFIED, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*