# In re WEST COAST INTERVENTIONAL PAIN MEDICINE, INC.,

In re Surgical Leasing Company, Inc., San Diego Pain Management Consultants, Inc., CV Surgical Management, Inc., The Pain Management Group, Inc., Medical Facilities Management G.P., Debtor/Debtor–in–Possession.

Nos. 09–24379 JPK, 09–24389, 09–24381, 09–24391, 09–24392, 09–24676.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division.

Aug. 12, 2010.

Jeffrey M. Monberg, Esq., Krieg De-Vault, L.L.P., Schererville, IN, for the creditor Anna May Webb.

David K. Welch, Esq., Crane, Heyman, Simon, Welch & Clar, for the Debtors.

*ORDER ON MOTION FOR AN ORDER CHANGING VENUE OF JOINTLY ADMINISTERED CASES TO THE SOUTHERN DISTRICT OF CALIFORNIA*

J. PHILIP KLINGEBERGER, Bankruptcy Judge.

The voluntary Chapter 11 case of West Coast Interventional Pain Medicine, Inc. was initiated by a petition filed on October 9, 2009. It was joined in bankruptcy in relatively short order by five of its friends: Surgical Leasing Company, Inc., filed on October 9, 2009 [case number 09–24389]; San Diego Pain Management Consultants, Inc., filed on October 9, 2009 [case number 09–24381]; CV Surgical Management, Inc., filed on October 9, 2009 [case number 09–24391]; The Pain Management Group, Inc., filed on October 9, 2009 [case number 09–24392]; and Medical Facilities Management G.P., filed on October 29, 2009 [case number 09–24676]. By an order entered on November 20, 2009 in each of the first five cases, all of which involve corporate debtors, the court ordered that cases numbers 09–24379, 09–24389, 09–24381, 09–24391 and 09–24392 would be jointly administered under the caption of case number 09–24379. By order entered on December 8, 2009, the last-filed case of Medical Facilities Management, G.P.—which is a California general partnership—was ordered jointly administered with the other five cases, again under the caption of 09–24379. On December 16, 2009, Anna May Webb, who is a creditor of all six of the debtors, filed her Motion for an Order Changing Venue of Jointly Administered Cases to the Southern District of California ["Webb's Motion"]. As its title suggests, Webb's Motion seeks transfer of all six of the foregoing cases, as jointly administered, to the United States Bankruptcy Court for the Southern District of

California. On January 4, 2010, the debtors filed an objection to Webb's Motion. Hearings on the venue transfer motion were held on February 9, 2010 and on March 4, 2010, at which the parties presented evidence and argument as to their respective positions concerning Webb's Motion. The record was closed at the conclusion of the March 4, 2010 hearing.

Webb's Motion presents a contested matter to the court pursuant to Fed. R.Bankr.P. 9014. The court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(a) and (b); 28 U.S.C. § 157(a); and N.D.Ind.L.R. 200.1. The contested matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

## I. *RECORD BEFORE THE COURT*

The record with respect to this contested matter is comprised of the following:

1. Webb's Motion;

2. The debtors' objection to Webb's Motion; and

3. The record established at the hearings held on February 9, 2010 and March 4, 2010.

## II. *ISSUES PRESENTED*

Webb's Motion raises two issues:

A. Whether venue of the debtors' cases in the United States Bankruptcy Court for the Northern District of Indiana is proper under 28 U.S.C. § 1408.

B. If venue is proper under 28 U.S.C. § 1408, whether venue of the cases should be transferred to the United States Bankruptcy Court for the Southern District of California pursuant to 28 U.S.C. § 1412 and Fed.R.Bankr.P. 1014(a)(1).

Webb asserts that all six cases, as jointly administered, should be transferred to the United States Bankruptcy Court for the Southern District of California. The

debtors contend that the cases are properly lodged in the United States Bankruptcy Court for the Northern District of Indiana.

## III. *ANALYSIS*

### A. *Propriety of Venue Under 28 U.S.C. § 1408*

28 U.S.C. § 1408 states:

**§ 1408. Venue of cases under title 11**

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district-

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Sub-paragraph (2) of this statute has no applicability to this case.

In *Peachtree Lane Associates, Limited,* 150 F.3d 788 (7th Cir.1998), the United States Court of Appeals for the Seventh Circuit stated the standard for determination of proper venue under 28 U.S.C. § 1408's provision that venue is proper in a district in which the "principal place of business in the United States ... of the entity that is the subject of such case [has] been located for the one hundred eighty days immediately preceding [the commencement of the case]".[1]

The *Peachtree* Court adopted the analysis of the United States Court of Appeals for the Fifth Circuit in *In re Commonwealth Oil Refining Co.,* 596 F.2d 1239 (5th Cir.1979) *cert. denied,* 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). The principal analysis is stated as follows:

The most comprehensive treatment we have found of the issue presented here is the Fifth Circuit's discussion in *In re Commonwealth Oil Ref. Co.,* 596 F.2d 1239 (5th Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 732, 62 L.Ed.2d 731 (1980). That case addressed a Chapter 11 venue provision that preceded § 1408, which only became effective in 1984, but it too provided for venue in the judicial district "where the debtor has 'had its principal place of business or its principal assets for the preceding [six] months or for a longer portion thereof than in any other district.'" *Id.* at 1241 (quoting former Bankr.R. 116(a)(2)). As in this case, the parties in Common-

---

1. *Peachtree* involves a somewhat aberrant context concerning the venue issue which it determines. The case does not involve a direct motion under Fed.R.Bankr.P. 1014. Rather, the appellants in *Peachtree* indirectly challenged a judgment entered against them on an adversary complaint which Peachtree had filed in the bankruptcy court in which its Chapter 11 case had been filed. Although not expressly stated in the opinion, it is to be assumed that the venue issue had been raised in the adversary proceeding, presumably pursuant to Fed.R.Bankr.P. 7012(b)/Fed.R.Civ.P. 12(b)(3). As stated in footnote 2 of the opinion (150 F.3d at 792), the bankruptcy judge had considered and denied the appellants' motion to transfer the adversary proceeding to the Southern District of Texas, apparently pursuant to 28 U.S.C. § 1412; however, the appellants did not pursue that decision in their appeal. Thus, the decision in *Peachtree* relates to the propriety of venue under 28 U.S.C. § 1408, and the determination in that case is at best *dicta* with respect to issues under 28 U.S.C. § 1412 and Fed.R.Bankr.P. 1014(a)(1).

wealth Oil agreed that the debtor's principal assets were in Puerto Rico, where its physical plant was located. The debate between them focused on whether the debtor's principal place of business also was there, or whether it instead was in San Antonio, where the company maintained its executive offices and managed the Puerto Rico refining and petrochemical operations. *Id.* at 1241–44. In choosing between these two locales, the Fifth Circuit first reviewed the history of Chapter 11's venue provision in order to aid its understanding of the phrase "principal place of business":

> Prior to the adoption of the current Chapter XI venue provision in 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter XI cases to the corporation's principal place of business. Chapter X of the Bankruptcy Act, on the other hand allowed for venue in both the district where the corporation maintains its principal place of business or its principal assets. Rule 116(a)(2) changed the Chapter XI venue provision to conform to Chapter X's standards. The change is significant for at least two reasons. First, it sheds some doubt on the validity of old case law construing Chapter XI's prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a debtor's principal place of business is not necessarily at the same location as its principal assets.

*Id.* at 1244–45 (footnotes omitted). The court observed that given these expanded venue options, "it is no longer necessary to choose between the places of production and management." *Id.* at 1245. Although the location of a debtor's production facilities is still relevant to the principal place of business inqui-

ry, it is less significant than before "because the location of the debtor's principal assets is now an independent basis of venue." *Id.* In the end, although the principal place of business inquiry is primarily a factual one on which the bankruptcy court must be given considerable latitude, the Fifth Circuit found that it is likely the place where general operations are supervised. *Id.* at 1246–47. As such, the Fifth Circuit concluded that the bankruptcy court did not clearly err in finding that Commonwealth Oil's principal place of business was in San Antonio, not Puerto Rico. *Id.* at 1247.

Like a number of bankruptcy and district courts, we find *Commonwealth Oil's* discussion of the issue persuasive. *See Peachtree,* 206 B.R. at 920–21 (collecting decisions that have followed *Commonwealth Oil* in finding that an entity's principal place of business is the place where its major business decisions are made); *see also, e.g., In re Vienna Park Properties,* 120 B.R. at 327–29; *In re Sundance Corp.,* 84 B.R. 699, 700–01 (Bankr.D.Mont.1988); *In re Landmark Capital Co.,* 19 B.R. 342, 347 (Bankr. S.D.N.Y.), *aff'd,* 20 B.R. 220 (S.D.N.Y. 1982). We are in agreement with the Fifth Circuit that the "most important, consequential, or influential" place where a corporation or partnership does its business is likely to be the place where its management decisions are made. *Soliman,* 506 U.S. at 174, 113 S.Ct. 701, 121 L.Ed.2d 634. This focus on the location of the entity's primary decisionmakers is particularly appropriate, we think, in a reorganization case like this one, as such proceedings generally will involve the financial management of the debtor, rather than its day-today operations. *Commonwealth Oil,* 596 F.2d at 1246; *see also Capitol Motor Courts v. Le Blanc Corp.,* 201 F.2d 356,

359 (2d Cir.), *cert. denied,* 345 U.S. 957, 73 S.Ct. 940, 97 L.Ed. 1378 (1953). As the bankruptcy judge aptly observed in this case: When a single asset real estate entity files a petition under chapter 11, the case is not likely to be about renegotiating the individual lease or deciding to increase rent $25.00 a month. The typical chapter 11 case for a single asset real estate entity is about raising new capital, renegotiating loan terms, or, if that cannot be done, attempting to "cram down" a plan on the secured creditors, or selling the asset. In determining where venue is proper in such a case, courts therefore look to where those persons who will make those key decisions are located.

*In re Peachtree Lane Assoc.,* 198 B.R. at 282; *see also In re Great Lakes Hotel Assoc.,* 154 B.R. at 672 n. 3; *In re Garden Manor Assoc.,* 99 B.R. 551, 554–55 (Bankr.S.D.N.Y.1988). Judge Barliant recognized that there may be exceptions to this general rule, but he found that this particular single-asset Chapter 11 proceeding was no different from the typical case he had described. *Peachtree Lane Assoc.,* 198 B.R. at 283. The major business decisions in this case, according to the court's undisputed factual findings, were made by Kemper personnel in Chicago or Long Grove, Illinois. Given those findings, it was not clearly erroneous for the bankruptcy court then to conclude that Peachtree's principal place of business during the venue period was in the Northern District of Illinois.

150 F.3d at 794–796. The analytical framework adopted by the Seventh Circuit from the Fifth Circuit has commonly been described as the "nerve center" analysis. Under this formulation, the critical focus of § 1408 is the location at which supervisory/management decisions on behalf of the debtor are actually made.[2]

■ Four of the five corporate debtors are incorporated under the laws of the State of California: West Coast Interventional Pain Medicine, Inc.; Surgical Leasing Company, Inc.; CV Surgical Management, Inc.; and San Diego Pain Management Consultants, Inc. The Pain Management Group, Inc. was incorporated under the laws of the State of Delaware. Medical Facilities Management, G.P. is a California general partnership. All five of the corporate debtors are suspended from doing business in the State of California due to non-payment of corporate franchise taxes. No evidence was submitted to establish that any of the six entities have applied for, or have been granted, authorization to do business in the State of Indiana through the Office of the Secretary of State of Indiana, and the court determines that none of the six entities is therefore authorized to conduct business in the State of Indiana under laws applicable to formal admission to do business in this state. All six of the debtors originally conducted business in the State of California. Dr. Paul Kevin Barkal is the sole shareholder, director and officer of each of the five debtor corporations; he is the sole principal for Medical Facilities Management, G.P., as a result of his control over Strategic Leasing Company which is the sole remaining general partner of that debtor entity.

San Diego Pain Management Consultants, Inc. and West Coast Interventional

---

**2.** Although relating to the principal place of business of a corporation for the purpose of diversity jurisdiction under 28 U.S.C. § 1332(c)(1), the Supreme Court's decision in *Hertz Corporation v. Friend,* —— U.S. ——, 130 S.Ct. 1181, —— L.Ed.2d —— (2010) is fully supportive of the Seventh Circuit's "nerve center" standard.

Pain Medicine, Inc. were primarily professional medical corporations involved in providing patient services for treatment of chronic pain. The other four entities owned, operated and managed out-patient surgical centers. Apart from San Diego Pain Management Consultants, Inc., none of the entities ever rendered services to patients other than in the State of California. San Diego Pain Management Consultants, Inc. rendered services both in California, and also in Illinois during the period of 1992 through 1996 or 1997, according to Dr. Barkal's testimony. Dr. Barkal testified that the "providing of patient services and facilities services by the company ceased at the end of 2004". In 2005, Dr. Barkal decided—as he termed it—to "relocate" the six entities to the State of Indiana. He testified that he notified the State of Indiana that the companies had transferred to the state. He took with him certain business records of the entities when he re-established his personal location/residence at 8445 Oakwood Avenue, Munster, Indiana. Dr. Barkal testified that Indiana state tax returns were prepared and filed for the entities in 2006, 2007 and 2008; that the street address stated in the tax returns for the companies was 8445 Oakwood Avenue, Munster, Indiana; and that the mailing address of the companies so stated as P.O. Box 1966, Highland, Indiana 46322. The records that he utilized to prepare the tax returns were located in Munster, Indiana and Arlington Heights, Illinois. After 2004, the activity of each of the companies was limited to collecting outstanding accounts receivable that had been generated through the operation of the businesses prior to 2005. Dr. Barkal has resided in Munster, Indiana since his relocation to Indiana in 2005.

The outstanding accounts receivable of the six entities are presently in the control of Martin Goldberg, a receiver appointed by courts in the State of California to administer the assets of the entities with respect to collection of a judgment obtained by Anna May Webb in the California courts. Goldberg's position as a receiver is solely with respect to collection of the judgment obtained by Anna May Webb, and he does not administer any function with respect to any of the six debtor entities in any other context.

As stated above, under the Seventh Circuit's "nerve center" analysis, the critical focus for the propriety of venue under 28 U.S.C. § 1408 is the location at which supervisory and management decisions on behalf of an entity are actually made. While the record establishes that the ability of the debtor entities to conduct business in California has been suspended, that suspension did not effect a dissolution of the corporations or of the partnership. However, the effect of suspension under California law appears to significantly impair an entity's ability to conduct business. As stated in an article entitled "Keeping the Debtor in 'Suspense': California Corporate Status in Chapter 11", Vol 30 Cal. Bankr. J. No. 4 (2010):

> Suspension does not terminate corporate existence or convert a corporation into any other type of business entity. Instead, suspension triggers a severe impairment of corporate powers.[15] A suspended corporation cannot exercise any right, power or privilege except as expressly reserved by statute, and such reservations are few and narrow.[16] Furthermore, suspension renders voidable all contracts entered into by the suspended corporation. A suspended corporation may also lose the use of its name if during suspension that name is adopted by another corporation.[17]

> Of particular significance to bankruptcy practitioners, suspension strips a corporation of its capacity to take advantage

of the courts. During the period when a corporation's powers are suspended, the corporation may neither prosecute nor defend an action, nor may it appeal from an adverse judgment to seek other relief such as a writ of mandate.[18] The incapacity to sue, defend or appeal under state law will also preclude a corporation from suing, defending or appealing in federal court, including in bankruptcy proceedings.[19] In fact, a corporation may be precluded from bringing suit even on a federal cause of action, the enforcement of which is important to the economy and public policy.[20] Attorneys who represent a suspended corporation in court proceedings may be subject to sanctions.[21]

California's ban on actions by suspended corporations reaches beyond the corporation itself to its officers, directors and controlling persons. When a corporation is suspended, it is a misdemeanor under section 19719 of the CTL for any person to "attempt" or "purport" to exercise corporate powers.[22] Section 19719 may extend criminal liability not only to directors and officers, but also to other authorized agents of a suspended corporation, including its attorneys. If corporate action on behalf of a suspended corporation is legally prohibited, individuals taking any such action may not be entitled to "corporate shield" protection against liability arising as a result. Fortunately, California law authorizes the revivor of suspended corporations.[23] Upon completion of the required procedures, a certificate of revivor can be issued. As a result not only can a corporation regain its rights and privileges, contracts it entered into during the period of suspension can also be made non-voidable.

---

15 *See generally*, R. BRADBURY CLARK, BALLANTINE STERLING CALIFORNIA CORPORATION LAWS § 302.02 (4th ed. 2009) (hereinafter, "Ballantine & Sterling").

16 Examples of the limited range of the permissible activities include: (I) filing an application for exempt status, (ii) amending articles of incorporation as necessary to perfect that application or to set forth a new name and (iii) filing the delinquent and other annual statements required by section 1502. *See* CAL. CORP. CODE § 2205(c) and (iv), CAL. REV. & TAX CODE § 23775.

17 *See Boyer v. Jones*, 105 Cal.Rptr.2d 824, 827, 88 Cal.App.4th 220, 224 (2001) ("[T]he right, power or privilege to hold a corporate name and prevent another from adopting that name is not exempted from the disqualification of the exercise of right, powers, and privileges that affects a suspended corporation.").

18 BALLANTINE & STERLING at § 302.02[1].

19 *See Gough v. Titus (In re Christian & Porter Aluminum Co.)*, 584 F.2d 326, 331 (9th Cir.1978) (incapacity to sue or be sued of suspended corporations extends to bankruptcy proceedings).

20 *See, e.g., Community Elec. Serv. v. Nat. Elec. Contractors Ass'n*, 869 F.2d 1235, 1239 (9th Cir.1989) (court rejected plaintiff's contention that federal antitrust law should prevail over state law because the action was an antitrust action and thus a federal interest was involved).

21 *See Palm Valley Homeowners Ass'n, Inc. v. Design MTC*, 102 Cal.Rptr.2d 350, 353–55, 85 Cal.App.4th 553, 558–60 (2000) (trial court did not abuse its discretion in imposing sanctions on a suspended corporation's law firm for continuing litigation activities on behalf of a corporation that it knew to be suspended); *but see Castro v. Feder (In re Realty Trust Corp.)*, 1994 WL 202439, at *2, 1994 U.S.App. LEXIS 13034, at *6 (9th Cir. 1994) (trial court did not abuse its discretion in reconsidering its order imposing sanctions against attorneys for filing a chapter 11 bankruptcy petition on behalf of a dissolved corporation, because although the debtor was inactive and not capable of rehabilitation, attempting to resolve legal disputes with third parties in one forum was a permissible goal in chapter 11).

22 CAL. REV. & TAX CODE 19719 ("Any person who attempts or purports to exercise the powers, rights, and privileges of a corporation that has been suspended pursuant to Section 233021 ... is punishable by a fine of

not less than two hundred fifty dollars ($250) and not exceeding one thousand dollars ($1,000), or by imprisonment not exceeding one year, or both fine and imprisonment.").
    23 *See generally* BALLANTINE & STERLING § 303.01.

The sole "business" of any of the six debtor entities is now their respective interests in accounts receivable owed to them by various debtors. This "business activity" has at this point been precluded by the operation of the California receivership administered by Martin Goldberg. However, Goldberg's administration of the receivership does not divest any of the six entities of their property interests in the accounts receivable, and those receivables constitute property of the debtors' respective bankruptcy estates under 11 U.S.C. § 541(a). The evidence, provided by Dr. Barkal's testimony, is uncontroverted that the entities have filed Indiana tax returns. The records necessary for the filing of those returns were in the possession of Dr. Barkal at his residence in Munster, Indiana and at his accountant's office in Arlington Heights, Illinois. While severely limited in the scope of any formal business operations, the six debtor entities still continue to exist, and to the extent of their functional capability, that functional capability is exercised solely by Dr. Paul Kevin Barkal from his residence in Munster, Indiana. Martin Goldberg has no authority of any nature to undertake corporate or partnership activities on behalf of any of the six debtor entities: his role is solely limited to collecting accounts receivable owed to the six entities for the benefit of application to the judgment of Anna May Webb. In fact, in this context, he has no responsibility whatsoever to any other creditor of any of the entities, and any money he has ever collected or will ever collect in his capacity as a receiver will not inure to the benefit of any other creditors apart from Anna May Webb and professionals associated with the collection of her judgment. Finally, to the extent any of the debtor entities could possibly be reinstated in the State of California, any actions to undertake that reinstatement could only be taken by Paul Kevin Barkal from his residence location in Munster, Indiana.

■ One may liken the present status of the six debtor entities to a patient *in extremis*, on life support in a hospital. The patient may be barely breathing and barely conscious, but the patient's nervous system is still alive in the patient. It is much the same here. There is nothing in the "nerve center" analysis which quantifies the viability of a debtor's nervous system or the extent to which that nervous system is fully capable of functioning in relation to a debtor entity. The analysis focuses on the actual location of the "nerve center", however vibrant or incapacitated that nervous system may be. All six of the debtor entities still have legal existence and can in fact and in law undertake certain limited activities. To the extent any such limited activities can be engaged in by any of the six entities, the only person who can cause the corporal body of the entities to respond to a stimulus or a command is Dr. Paul Kevin Barkal. It is undisputed that Dr. Barkal is presently residing in, and has since 2005 resided in, Munster, Indiana. Thus, to the extent that any of the six entities can independently engage in any activity whatsoever, the "nerve center" for the exercise of that activity is in the Northern District of Indiana.

Based upon the foregoing, the court determines that venue of the six corporate cases, as consolidated for joint administration, is properly lodged in the United States Bankruptcy Court for the Northern District of Indiana pursuant to 28 U.S.C. § 1408.

B. *Transfer of Venue Pursuant to 28 U.S.C. § 1412/ Fed.R.Bankr.P. 1014(a)(1)*

Webb contends that should the court find that venue is proper in the Northern District of Indiana—as the court has—the six jointly administered cases should be transferred to the United States Bankruptcy Court for the Southern District of California pursuant to 28 U.S.C. § 1412/ Fed.R.Bankr.P. 1014(a)(1).

28 U.S.C. § 1412 states:

A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

Fed.R.Bankr.P. 1014(a)(1) states:

**Rule 1014. Dismissal and Change of Venue**

(a) Dismissal and Transfer of cases

(1) Cases filed in proper district

If a petition is filed in a proper district, the court, on timely motion of a party in interest, and after hearing on notice to the petitioners or on its own motion, the United States trustee, and other entities as directed by the court, the case may be transferred to any other district if the court determines that the transfer is in the interest of justice or for the convenience of the parties.[3]

The judicial determination with respect to analysis under the foregoing provisions which the court has adopted is *Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239 (5th Cir.1979), *rehearing and rehearing en banc denied*, August 9, 1979. The Fifth Circuit's analysis has been colloquially denominated as the "COMCO" test. The court deems the COMCO analysis to be the principally controlling analysis to be

employed in a transfer of venue request under the foregoing provisions.

▉▉▉ 28 U.S.C. § 1412 and Fed. R.Bankr.P. 1014(a)(1) have two *separate* tests which determine whether or not venue of a Chapter 11 case should be transferred to another court: in "the interest of justice" *or* "for the convenience of the parties". As stated in *Commonwealth Oil Refining Co., Inc.*, the factors under the prong of "convenience of the parties" is to be determined by analysis under six elements:

Under the heading of convenience of the parties the bankruptcy court listed six factors:

(1) The proximity of creditors of every kind to the Court;

(2) The proximity of the bankrupt (debtor) to the Court;

(3) The proximity of the witnesses necessary to the administration of the estate;

(4) The location of the assets;

(5) The economic administration of the estate;

(6) The necessity for ancillary administration if bankruptcy should result.

*Commonwealth Oil Refining Co., Inc.*, 596 F.2d 1239, 1247. The COMCO factors principally focus on the element of "convenience of the parties". This court deems the concept of "interest of justice" to include the impact of venue on regulatory authorities who can be reasonably foreseen to be involved in a Chapter 11 case, and the court will address its analysis in this context as well.

▉▉▉ In applying the COMCO factors, this court deems the pertinent inquiry to be the actual existence, at the time that a hearing on transfer of venue is held, of

---

**3.** The court has determined 3 that this Chapter 11 case was initially filed in the proper district; therefore, only sub-paragraph (a)(1) of Fed.R.Bankr.P. 1014 is applicable.

relationships relevant to the COMCO factors. While a number of things might happen in the course of administration of a Chapter 11 case, a decision under 28 U.S.C. § 1412/Fed.R.Bankr.P. 1014(a)(1) cannot be focused on "mights"; rather, it must be focused on concrete facts that exist at the time that the motion is considered.

■ The six factors of the test involving "convenience of parties" will first be addressed, followed by discussion of the element of "interest of justice".

### 1. *Convenience of the Parties*

■ The first factor to be considered is the proximity of creditors of every kind to the court. The two court choices are Hammond, Indiana and the Southern District of California. The analysis of this factor, when properly done, focuses on creditors who may be active in the case in some manner, either as asserting affirmative matters in the case or involved in contested claim litigation. A numerical calculation of the number of claims filed by California creditors as contrasted to creditors whose locus is in or in proximity to Indiana is not the dispositive analysis to be applied, but let's start there.

Identification of creditors and potential creditors in relation to all six of the debtors discloses the following, derived from the debtor's individual schedules and the claims register with respect to each debtor:

|  | Schedules | | | Claims Register | | |
|---|---|---|---|---|---|---|
|  | Cal. | Ind. | Neutral | Cal. | Ind. | Neutral |
| (1) West Coast | 10 | 13 | 1 | 5 | 1 | 1 |
| (2) Pain Management | 11 | 12 | 1 | 3 | 1 | 0 |
| (3) Surgical Leasing | 9 | 9 | 1 | 4 | 1 | 1 |
| (4) San Diego | 17 | 13 | 1 | 5 | 1 | 1 |
| (5) CV Surgical | 9 | 12 | 1 | 4 | 1 | 1 |
| (6) Medical Facilities | 9 | 9 | 1 | 4 | 2 | 1 [4] |

As the foregoing chart establishes, with respect to each of the entities, the number of creditors designated in the debtors' schedules having a location in California predominates over creditors have a location in Indiana only with respect to San Diego Pain Management Consultants, Inc.; the tally is even with respect to Surgical Leasing, Inc. and Medical Facilities Management; and "Indiana" creditors have a slight edge with respect to the other three entities. However, when one looks at the claims registers with respect to all six entities, entities having a locus in California predominate with respect to all six debtors. Moreover, based upon the record, it is a near certainty that certain of the claims of California creditors will be challenged by objection by the debtor in each of the six cases, while claims filed by the "Indiana" creditors will almost certainly be accepted without challenge. This factor favors transfer of the case to the Southern District of California.

The next factor is the proximity of the debtor to the court. As stated in the analysis with respect to 28 U.S.C. § 1408, the "debtor" with respect to each of the

---

4. With respect to the debtors' schedules, the inclusion of creditors in relation to California was derived from the addresses stated by the respective debtor in its Schedules. The designation of creditors in relation to Indiana includes both creditors in Illinois and Indiana.

The "neutral" designation is the Internal Revenue Service, which has a presence throughout the United States and is not isolated to being involved in any particular district. The count with respect to the claims registers follows the foregoing rules.

separate debtor entities is Dr. Paul Kevin Barkal, who resides in Munster, Indiana. This factor weighs in favor of the Northern District of Indiana.

The third factor is the proximity of witnesses necessary to estate administration. In the context of the present debtor-in-possession Chapter 11s, Dr. Barkal is an essential witness with respect to administration of the estate, and he resides in the Northern District of Indiana. Pending before the court are two contested matters, one initiated by the debtors respectively, and the other initiated by Martin Goldberg, as receiver, which concern the disposition of the accounts receivable of all of the debtors pursuant to 11 U.S.C. § 543. Clearly, Martin Goldberg is a "custodian" under that section, as defined by 11 U.S.C. § 101(11)(A). The debtors of course assert that all of the accounts receivable presently subject to administration by Goldberg should be turned over to the debtors; Goldberg asserts that the court should allow continued administration of that property by Goldberg pursuant to 11 U.S.C. § 543(d)(1). The question of whether the debtors or Goldberg administer the accounts receivable—essentially the only asset of any of the debtors—is a critical question in this case involving the administration of all six bankruptcy estates. The witnesses necessary for determination of this critical issue are Dr. Barkal and Martin Goldberg. Dr. Barkal is represented by counsel from Chicago, Illinois; Martin Goldberg is represented by counsel from California. Included in the administration of the estate are certain appeals now pending before a California administrative tribunal with respect to services performed by the debtors with respect to persons eligible for coverage by California's workmen's compensation laws. While as established by Martin Goldberg's testimony, a significant dollar amount of receivables are subject to legal issues which do not necessarily require factual testimony, the principal witness with respect to collection of accounts receivable is Dr. Barkal. Any factual matters involved in determination of claims to be allowed by the California Workers' Compensation Board which cannot be resolved by the submission of documentation involves Dr. Barkal. However, resolution of these claims must be made in California, and will not involve proceedings before this court. As Dr. Barkal testified, the debtors are owed a significant amount of money in accounts receivable apart from workmen's compensation claims, and to the extent resolution of any of those accounts receivable require litigation, the situs of all, or nearly all, of the account debtors is California, and any collection litigation would be required to be done in California, other than by this court.[5] Dr. Barkal is the individual who would be called upon to testify with respect to any collection litigation. Thus, with respect to the collection of accounts receivable—the only real property of any of these debtors—the locus of any contested actions with respect to that collection is California, not Indiana. Dr. Barkal is in Indiana, and because of outstanding warrants for his arrest in California, he has testified that he cannot appear in California. This is a circumstance of Dr. Barkal's making, and the court will not take into consideration any potential inability of Dr. Barkal to appear in California as a result of this circumstance in any analysis of the issues presented on the venue transfer motion. The determination of whether the assets of the debtors are administered by the debtor or continue to remain in the possession of Martin Goldberg as receiver involve two witnesses, one in California and one in

---

5. This court will not allow standard collection litigation to be undertaken in this court.

Indiana, and that consideration favors neither side. Collection of accounts receivable is centered in California: although the principal individual necessary for determination of any disputed collections resides in Indiana, those disputes require resolution in California. Apart from the outstanding warrants for his arrest in California, Dr. Barkal has testified that he cannot afford to travel to California. However, to the extent that litigation is required to collect receivables, the account debtors/witnesses are in California. Finally, as of July 28, 2010, there are seven (7) adversary proceedings associated with the debtors' cases. All of these involve defendants residing in, and activities which occurred in, California. Litigated resolution of these adversary proceedings will involve Dr. Barkal, but far more will involve multiple defendants as witnesses, and foreseeably other witnesses, located in California The end result: this factor favors transfer to California.

Location of assets of the bankruptcy estates is the next factor. The court deems this factor to not be subject to analysis of the "tax situs" or other jurisdictional situs with respect to accounts receivable. Rather, this factor concerns the effective administration of collection of accounts receivable. Let's assume that the laws of the State of Indiana and the laws of the State of California place the actual legal "situs" of accounts receivable in the domicile of the account creditor, which would be Indiana. That doesn't end the inquiry. In order to realize assets of the bankruptcy estates for the benefit of creditors, matters must be resolved before the California Workers' Compensation Board, and potential litigation must be undertaken in California. Apart from possible accounts receivable derived from the opera-

tion of business of one of the entities in Illinois for a relatively short period of time, *all* of the receivables of all six debtors arise from business operations in California. While Dr. Barkal asserts that many of the disputes with private insurance companies can be resolved by telephone conversations originated from Indiana, it is beyond question that certain of them will not be so resolved. It is beyond question that disputes regarding workmen's compensation payments to the six debtor entities, or any of them individually, involve proceedings solely in California. For the purposes of analysis of this factor, the location of the principal assets of all of the debtors is in California.

The next factor is economic administration of the estate. Viewed in present context, the sole administrator of the estates on behalf of each of the debtors-in-possession is Dr. Paul Kevin Barkal, who resides in Munster, Indiana. Dr. Barkal has testified that he cannot afford to travel to California to be involved in administration of the cases if the cases are transferred to that venue. It is also clear that Dr. Barkal is subject to potential arrest in California, a factor which the court—as stated—will not consider in any context. The counsel for each of the debtors-in-possession is in Chicago, and representation of the debtors by that counsel generates an administrative expense which is chargeable to the estate. There is pending before the court an application to employ an attorney from Northwest Indiana to undertake collection activity with respect to accounts receivable of all of the debtors. The court has not yet determined whether that application will be granted, and at this point that application and the contemplated counsel's location is not a factor that will be considered in this decision.[6] The stan-

---

6. However, apart from potential bankruptcy jurisdiction over collection of accounts receiv-

able in these cases, the only venue in which the accounts receivable can be collected is

dards to be employed with respect to the venue transfer motion require the court to view circumstances as they exist at the time of determination of the motion. Matters involving the administration of the estates of all six debtors intimately involve Dr. Barkal, who resides in Indiana. The counsel chosen to be employed by the debtor is from Chicago, and the court will not assume that if the cases are transferred to California, a California attorney will be sought to be engaged as principal counsel for the debtors-in-possession, thereby reducing the administrative claim payable to the debtors' counsel for involvement in administration of the cases. This factor favors the debtors.

The next factor is the necessity for ancillary administration. In the context of this factor, "ancillary administration" means resort to tribunals necessary for determination of issues involving the administration of the estate, or collection of property of the estate. There is clearly a need for administration of property of the debtors in a forum other than the United States Bankruptcy Court for the Northern District of Indiana. Accounts receivable constitute essentially the sole assets of the six debtors, and determination of the debtors' entitlement to recovery on those receivables almost exclusively involves an administrative tribunal/tribunals located in the State of California, or the utilization of the California courts. Any legal issues which may arise with respect to collection of accounts receivable will be determined exclusively under California law, and this concept is so obvious that the court does not deem it necessary to cite any authority for this proposition. To the extent any such determination involves the United States Bankruptcy Court, California bank-

ruptcy courts are much better versed in California law than is this court. Additionally, any determination of any state law issue by a federal court is much better left to courts in the state whose law is being interpreted. This factor favors transfer of the case to California.

By a strict "scorecard" analysis, the score with respect to the seven factors addressed above is: California, 4; Indiana, 2. Thus, transfer of the case to California is indicated by this rather artificial score keeping method, which provides no weight to the individual importance of any of the six separate factors in determining which side wins the battle. But weighting of the factors in this case gives equal weight to each. In balance, the court determines that the "convenience of parties" analysis results in transfer of venue to California.

There is a second separate prong to the analysis required for transfer of venue: Fed.R.Bankr.P. 1014(a)(1) provides for alternative consideration of whether transfer of the case to another district is in the interest of justice.

The "interest of justice" defined by the foregoing rule is an extraordinarily nebulas concept, and there is no law binding on this court which defines the criteria the court is to utilize in its analysis under this factor. Webb's counsel are of course focused on Webb's claim and the claims of individuals involved in the administration of the receivership whose sole function is to collect that claim. They argue, of course, that the primary creditors in the debtors' cases are creditors whose claims arise from a proceeding exclusively undertaken in California. Webb also argues that Dr. Barkal's "incapacity" to travel to California as a result of outstanding arrest

California, because it is only that state which has *in personam* jurisdiction over the defen-

dants who owe the debtors money.

warrants is his own doing, and that it is "just" to require the transfer of the cases to California as a form of punishment, perhaps. The debtors argue that a grave injustice has been done to the six debtors in the context of administration of the California receivership, in that exorbitant debts have been asserted as a result of that receivership for the collection of a relatively small judgment. As the court addressed several times during the course of the evidentiary hearing with respect to Webb's Motion, at times the parties tend to seek to litigate the circumstances of the receivership and the *exorbitant* expenses claimed by administrators of the receivership as the focus of Webb's Motion. Whatever views the parties have in relation to the administration of the receivership or its expenses is irrelevant to Webb's Motion. Whatever views the court may have as to the *incredible* administrative expense incurred with respect to collection of a personal injury judgment of significantly less than $200,000.00 is also irrelevant. One can hypothesize that Webb seeks to return the case to California because of her view that a bankruptcy court in California will be more inclined to accept circumstances involved in the receivership and its claims against the estates than will be a court in Northwest Indiana. On the other hand, the debtors understandably seek to remove from California courts the review of matters relating to the receivership, in the hope that a court not involved in the "local culture" in California will view matters with more of a jaundiced eye to the receiver. These hypothesized motivations are also irrelevant.

The "interest of justice" in the context of determining the venue transfer motion therefore has no relationship to issues regarding the administration of the receivership, or perceptions of either side as to whether a court in California or a court in Indiana will be more prone to accept or not accept matters arising from the receivership's administration.

The "interest of justice" in this case focuses on the ability of the debtors to administer the cases for the benefit of all creditors, not just Anna May Webb.[7] That ability in large part depends upon the ability of each of the debtors to proceed in its own right with matters which will necessarily be undertaken before California administrative bodies or California courts. None of the debtor entities is authorized to do business in California, and as previously stated, the power and authority of each of the debtors to effectively engage in necessary activities in relation to administration of the estate in California appears to be significantly impaired by reason of California law in relation to suspension of corporate franchises. It is not unforeseeable that disputes may arise in which the debtors may seek recourse to the bankruptcy court to determine the scope of their respective authorities to proceed in certain matters necessary to the administration of the case in light of the apparent significant limitations imposed by California law. There are also significant issues in relation to the capacity of the debtors to be engaged in bankruptcy proceedings, given that the laws of California by which four of the debtor corporations are governed may preclude their very ability to file a bankruptcy petition; *see*, "Keeping the Debtor in 'Suspense': California Corporate Status in Chapter 11", Vol 30 Cal. Bankr.J. No. 4 (2010), pages 383–390. It is conceivable that the debtor could argue that California law does not apply to the debtor's capacity to file a bankruptcy case in the Northern District of Indiana. However, there is no

7. None of these debtors is engaged in business, and the involvement of any regulatory authority in continued operation of business is not a factor in this case.

evidence before the court that any of the debtor entities is admitted to do business in Indiana. Thus, if an entity were to challenge any of the debtor's capacity to file a bankruptcy case because of its status with regulatory corporate authorities in either Indiana or California, the court to which those issues would be addressed would be confronted with at least consideration of the debtor's status under California law in relation to access to the federal courts. The debtors' capacities to pursue relief under Chapter 11 are therefore at least potentially questionable under California law with respect to four of the debtors. Any issue arising in any of the six debtors' cases which requires the application of state law will require the application of California law, not that of the State of Indiana. A federal court which construes state law creates in some context a precedential determination of state law, potentially applicable to other cases apart from that before it. This court is of the opinion that it is far more appropriate for a federal court which routinely deals with a particular state's law to be involved in this process.

Because further administration of the debtors' cases will involve issues of California law, and proceedings at the very least nearly exclusively in California to collect the estates' assets, the "interest of justice" prong favors transfer of the case to a United States Bankruptcy Court in California.

The court determines that the factors to be considered pursuant to 28 U.S.C. § 1412/ Fed.R.Bankr.P. 1014(a)(1) result in a determination that transfer of cases 09–24379, 09–24389, 09–24381, 09–24391, 09–24392 and 09–24676 to the United States Bankruptcy Court for the Southern District of California is appropriate. The analysis of the "convenience of parties" under Rule 1014(a)(1) results in transfer of

the cases. Additionally, the "interest of justice" consideration under the foregoing rule weighs conclusively in favor of transfer of the six cases.

## IV. *DETERMINATION*

Based upon the findings of fact and conclusions of law stated above pursuant to Fed.R.Bankr.P. 9014(c)/Fed.R.Bankr.P. 7052/Fed.R.Civ.P. 52(a), the court determines that the Motion for an Order Changing Venue of Jointly Administered Cases to the Southern District of California filed by Anna May Webb should be granted.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Webb's Motion is denied to the extent that it seeks to determine that venue of the six cases, as consolidated for joint administration, is not proper in the United States Bankruptcy Court for the Northern District of Indiana under 28 U.S.C. § 1408(1).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the cases of West Coast Interventional Pain Medicine, Inc. (case number 09–24379); Surgical Leasing Company, Inc., (case number 09–24389); San Diego Pain Management Consultants, Inc., (case number 09–24381); CV Surgical Management, Inc., (case number 09–24391); The Pain Management Group, Inc., (case number 09–24392); and Medical Facilities Management G.P., (case number 09–24676) will be, and hereby are, transferred to the United States Bankruptcy Court for the Southern District of California, pursuant to 28 U.S.C. § 1412/ Fed.R.Bankr.P. 1014(a)(1).

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all associated cases (adversary proceedings) are also transferred to the United States

Bankruptcy Court for the Southern District of California.